Argued and submitted December 6, 2013, portion of judgment reversing petitioner's convictions on Counts 7, 8, 9, and 10 reversed; otherwise affirmed September 4, 2014

JOHN STEVEN BURCHAM,
*Petitioner-Respondent,*

*v.*

Steven FRANKE,
Superintendent,
Two Rivers Correctional Institution,
*Defendant-Appellant.*

Umatilla County Circuit Court
CV110550; A150449

335 P3d 298

Karla H. Ferrall, Assistant Attorney General, argued the cause for appellant. With her on the brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General.

Jesse Wm. Barton argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.*

GARRETT, J.

---

* Garrett, J., *vice* Duncan, J.

**GARRETT, J.**

Petitioner was convicted of several crimes arising from an incident in which he provided alcohol to a 16-year-old girl and, while she was intoxicated, sexually assaulted her. We affirmed petitioner's convictions on direct appeal. Petitioner then sought post-conviction relief on the ground that his trial counsel was inadequate. The post-conviction court accepted the petition and reversed petitioner's judgment of conviction in its entirety. The state appeals, assigning error to that ruling. We affirm in part and reverse in part.

## I.  BACKGROUND

The facts pertinent on appeal are undisputed. In September 2007, the victim, F, was invited by her friend, S, to attend a birthday party for S's father. Petitioner, who is S's uncle, was also at the party. At the time, F was 16 years old; petitioner was 48. After the party, petitioner invited F and S to his home to see his taxidermy collection. When they arrived, petitioner prepared margaritas. F and S each drank at least six margaritas. Petitioner later served other mixed drinks and shots of alcohol. The girls accepted all of the drinks that petitioner gave them, although F poured out some of the shots on the ground because she was worried about having had "severely too much" to drink. After several hours, petitioner began to dance with F. S was alarmed because she realized that F was "very drunk," and S thought that the dancing was inappropriate. By the end of the night, F was slurring her words and having trouble walking. Petitioner called S's parents and told them that, because S and F had been drinking, they were going to stay overnight at his house.

At about 2:00 a.m., F and S decided to go to bed. Petitioner told them that they could sleep in his spare bedroom. Before going there, F went to get a glass of water. As she was returning, petitioner stopped her in the hallway, took her into his bedroom, laid her on his bed, and removed her pants and underwear. F testified that she attempted to stand up but could not because she was "severely intoxicated." She testified that petitioner performed oral sex on her and then attempted to penetrate her vagina with his

penis. F felt a "sharp shooting pain" that jolted her out of her "extremely drunken state." F ran out of the room screaming for S.

S found F in the hallway and brought her back to the guest bedroom. S retrieved F's pants and underwear and helped her get dressed. F was "crying frantically." S drove them back to S's parents' house. The next day, S's father took S and F to the police station, where they were both interviewed by police. Later, S's mother took S and F to the hospital. F was interviewed by Sexual Assault Nurse Examiner (SANE) Kathy Wade. A SANE is an emergency room nurse who specializes in examining victims of sexual assaults. S was present during the interview. During her examination of F, Wade observed "a small, linear *** skin tear, that was about a centimeter long *** between [F's] hymen and her labia minora." Wade attempted to photograph F's injuries, but the camera she was using failed. Instead, Wade drew the location of the injury on a printed diagram of a woman's genital area that was included in a standardized documentation form. On that same form, Wade wrote "small skin tear, non-bleeding, approx 1 cm long."

Petitioner was charged with two counts of rape in the first degree, ORS 163.375 (Counts 1 and 2); two counts of sodomy in the first degree, ORS 163.405 (Counts 3 and 4); two counts of sexual abuse in the first degree, ORS 163.427 (Counts 5 and 6); two counts of sexual abuse in the second degree, ORS 163.425 (Counts 7 and 8); and two counts of furnishing alcohol to a minor, ORS 471.410 (Counts 9 and 10).

As charged in this case, the crimes alleged in Counts 2, 4, and 6 required the state to prove, *inter alia*, that F was "incapable of consent by reason of mental incapacitation." At the relevant time, "[m]entally incapacitated" was defined in ORS 163.305(4) (2007), *amended by* Or Laws 2009, ch 770, § 1, as follows:

> "'Mentally incapacitated' means that a person is rendered incapable of appraising or controlling the conduct of the person at the time of the alleged offense because of the influence of a controlled or other intoxicating substance *administered to the person without the consent of the person*

or because of any other act committed upon the person without the consent of the person."[1]

(Emphasis added.) The state's theory at trial was that, at the time of the sexual contact, F was mentally incapacitated because petitioner "administered" alcohol to her without her "consent"; that is, although F had voluntarily consumed the drinks, her age made her legally unable to consent to drink alcohol. Consistently with that theory, the state argued during its opening statement that

> "[F] was mentally incapacitated as a result of the alcohol *** that the [petitioner] administered to her, essentially. And that—so this mental incapacitation, it means something maybe a little bit different than what we would think of in layperson's terms. The actual definition is that a person becomes mentally incapacitated as a result of any intoxicating substance, drugs or alcohol, administered to them without their consent.
>
> "And while [F] might have agreed to take some of these drinks, she cannot legally consent to do that in this situation."

At trial, Wade testified for the state about her examination of F. She testified that a tear of the skin like what she found on F is "usually caused by a blunt force trauma." Wade also testified that her observations during her examination of F were consistent with the account that F gave during the interview at the hospital. In particular, she explained that similar skin tears can be caused by the penetration of the vagina by a penis. On cross-examination by petitioner's trial attorney, Wade acknowledged that the tear could have been caused by something other than sexual penetration. Petitioner's attorney also cross-examined Wade about her protocols for interviewing sexual assault victims, recording their responses, and documenting forensic evidence. He did

---

[1] In 2009, the legislature amended the definition of "mentally incapacitated" by deleting any reference to a controlled substance that is administered without the consent of a person. Or Laws 2009, ch 770, § 1. Thus, under current law, in order to show that a person was "mentally incapacitated," the state need prove only that the person was rendered "incapable of appraising or controlling the conduct of the person at the time of the alleged offense." ORS 163.305(4). Nevertheless, all references to ORS 163.305 in this opinion are to the 2007 version of the statute.

not, however, specifically question Wade about the camera failure or the hospital's protocols for documenting evidence of sexual assault.

In its instructions to the jury, the trial court explained that the charges in Counts 2, 4, and 6 were based on the state's theory that F was unable to "legally consent" to the consumption of alcohol. For example, with respect to Count 2, the court explained:

> "In this case, the defendant is charged with \* \* \* Count 2, Rape in the First Degree, that said defendant \* \* \* did unlawfully and knowingly engage in sexual intercourse with [F], a female who was incapable of consent by reason of mental incapacitation caused by the defendant administering alcohol to [F], [F] being unable to legally consent to the consumption of alcohol because she is sixteen years old and a minor."

At a later point during the jury instructions, the court explained what the state was required to prove in order to obtain convictions on Counts 2, 4, and 6. Those explanations tracked the language of the relevant criminal statutes. For example, the court informed the jury that,

> "[i]n this case, to establish the crime of Rape in the First Degree, the State must prove beyond a reasonable doubt the following four elements (1) that the act occurred in Deschutes County, Oregon (2) that the act occurred on or about September 8th, 2007 (3) that [defendant] knowingly had sexual intercourse with [F]; and (4) that [F] was incapable of consent by reason of mental incapacitation."

The court further explained to the jury that

> "mentally incapacitated means a person is rendered incapable of appraising or controlling his or her conduct at the time of the alleged offense because of the influence of a controlled or other intoxicating substance administered to the person without his or her consent or because of any other act committed on the person without his or her consent[.]"

Petitioner's trial counsel did not challenge the jury instructions or otherwise contest the state's theory that the absence of "consent" under the statute could be established by the mere fact of F's age.

The jury acquitted petitioner on Counts 1, 3, and 5, which alleged, respectively, first-degree rape, first-degree sodomy, and first-degree sexual abuse on the ground that F had been "physically helpless."[2] The jury convicted petitioner of the remaining counts, including Counts 2, 4, and 6 (the three "mentally incapacitated" counts). Petitioner appealed; we affirmed his conviction without issuing an opinion. *State v. Burcham*, 239 Or App 362, 246 P3d 520 (2010). Petitioner then filed a petition for post-conviction relief, alleging that his trial counsel provided inadequate assistance that deprived petitioner of his due process rights under Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution. The post-conviction court reversed petitioner's judgment of conviction in its entirety. The state now appeals.

## II. DISCUSSION

A post-conviction claim of ineffective assistance of counsel involves a two-part inquiry:

> "First, we must determine whether petitioner demonstrated by a preponderance of the evidence that [petitioner's lawyer] failed to exercise reasonable professional skill and judgment. Second, if we conclude that petitioner met that burden, we further must determine whether he proved that counsel's failure had a tendency to affect the result of his trial."

*Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002). The Supreme Court has observed that evaluating the constitutional adequacy of an attorney's trial performance is necessarily a fact-specific endeavor; thus, "[t]he search for a single, succinctly-stated standard, objectively applicable to every case, is a fool's errand." *Krummacher v. Gierloff*, 290 Or 867, 873-74, 627 P2d 458 (1981). Without question, however, "adequate" assistance requires an attorney to "investigate the facts and *** law to the extent appropriate to the nature and complexity of the case so that [counsel] is equipped to advise his [or her] client, exercise professional judgment[,] and represent the defendant in an informed

---

[2] *See* ORS 163.305(5) ("'Physically helpless' means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act.").

manner." *Id*. at 875. "In reviewing the decision of the post-conviction court, we are bound by its findings of historic facts that are supported by evidence in the record." *Lichau*, 333 Or at 359 (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)).

The post-conviction court reversed petitioner's judgment of conviction on two grounds. First, the court concluded that petitioner's trial counsel had been inadequate for failing to challenge the state's interpretation of the terms "administer" and "consent" in the relevant criminal statutes. Second, the court concluded that petitioner's trial counsel had been inadequate for failing to retain a qualified medical expert. According to petitioner's post-conviction petition, hiring a qualified medical expert would have allowed him to present evidence to rebut the state's explanation for the skin tear and to more effectively cross-examine Wade. The court entered a judgment allowing the petition for post-conviction relief, reversing the judgment of conviction, and remanding the case "for retrial or other appropriate proceedings."

For the reasons that follow, we conclude that the post-conviction court correctly ruled that petitioner was entitled to relief with respect to Counts 2, 4, and 6, all of which involved the state's novel theory about the meaning of the term "consent" in the statute defining mental incapacitation.[3] The post-conviction court erred, however, in reversing petitioner's convictions on Counts 7, 8, 9, and 10, because the record does not support a conclusion that the inadequacy of petitioner's trial counsel had a tendency to affect the result of the trial on those four counts.

A.    *The State's Mental Incapacitation Theory*

In its first assignment of error, the state argues that the post-conviction court erred in concluding that petitioner's trial attorney was inadequate for failing to challenge the state's theory that F was mentally incapacitated at the time of the sexual assault. That theory relied on a novel interpretation of the term "consent" as used in ORS 163.305(4) (defining "mentally incapacitated"); the state

_____

[3] We do not reach petitioner's alternative argument that his counsel should have also objected to the state's interpretation of the term "administered."

argued that F's age rendered her unable to consent to the consumption of alcohol. The petition for relief alleged, in relevant part, that the state's theory that F was "mentally incapacitated because she was under 21 years old and could not legally consent to consume the alcohol \* \* \* did not state a crime under statutes in effect at the time of the alleged offenses[.]" The post-conviction court agreed and concluded that a competent defense attorney would have recognized the state's interpretation as pure "silliness":

> "To me, it just seems the clear and easy, straightforward reading of the statute is, you give somebody something without their knowledge or consent, meaning, \* \* \* well, in the old days, it was the vodka in the fruit punch at the fraternity party. Today it's some sort of drugs in something. At first the person doesn't consent because they don't know it's there.

> "To me, that's the only rational reading of this statute \* \* \*.

> "[A]nybody, I think, who would sit down and spend the time to look at the statute would realize that the state, in offering their instruction and claiming this to be the way the statute reads, given reading the statute on its face, any lawyer who was competent would raise [an] objection."

On appeal, the state argues that the interpretation of ORS 163.305(4) that the state advanced at petitioner's trial was reasonable. The state explains that the statute did not have "a clearly understood meaning at the time" because "[n]either Oregon statutes nor case law provide that 'consent,' as used in [that statute], means only consent as a matter of fact." Those observations, however, beg the real issue in this case. As the Supreme Court has held, "[i]t is the 'reasonable professional skill and judgment' standard, and not generalized and imprecise rules of thumb such as 'unsettled questions of law,' that determines whether counsel rendered inadequate assistance." *Burdge v. Palmateer*, 338 Or 490, 500, 112 P3d 320 (2005). Thus, the first step in our analysis requires us to determine whether

> "a lawyer exercising reasonable professional skill and judgment would have recognized the statutory ambiguity, would have seen an interpretation that could benefit the defendant, and would have concluded under the circumstances

that the potential benefits of advancing that interpretation exceeded any risks."

*Id.* at 497.

If we determine that a reasonable exercise of professional skill and judgment should have led petitioner's counsel to challenge the state's interpretation of ORS 163.305(4), we also must decide whether petitioner was prejudiced by his counsel's failure to do so. *Lamb v. Coursey*, 238 Or App 647, 652, 243 P3d 139 (2010), *rev den*, 350 Or 230 (2011). Here, petitioner argues that he was prejudiced because, among other reasons, his trial counsel failed to challenge the state's interpretation of ORS 163.305(4) by moving for a "judgment of acquittal, directed verdict[,] or an arrest of judgment." Whether or not defendant was prejudiced by his trial counsel's failure to make those motions depends on whether those motions would have been successful. *See Lamb*, 238 Or App at 652 (whether the petitioner was prejudiced by his trial attorney's failure to argue that a three-year statute of limitations applied to one of his felony charges depended upon whether a hypothetical motion to dismiss on that ground would have been successful).

In short, the two-step inquiry into whether petitioner's trial counsel was inadequate requires us, in the context of this case, to determine (1) whether petitioner's counsel, in the exercise of reasonable professional skill and judgment, should have challenged the state's interpretation of ORS 163.305(4) at trial; and (2) whether, if such a challenge had been made, it would have been successful.

Following the methodology explained in *Burdge*, we conclude that petitioner's trial attorney should have challenged the state's interpretation of ORS 163.305(4). The state's theory was that F was "unable to legally consent to the consumption of alcohol because she is 16 years old and a minor." The text of ORS 163.305(4), however, does not include the phrase "legal consent" or any other term that would indicate that the legislature intended the term "consent" to mean anything other than factual consent. An attorney who is reasonably competent to practice law in this state should be aware that Oregon courts follow a methodology of

statutory interpretation that makes the "text and context" of a statute the most persuasive evidence of its intended meaning. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). Here, it should have been obvious that the state's theory of criminal liability was at significant variance from the text and context of the statute on which the state relied. That, in turn, should have prompted petitioner's attorney to "investigate the facts and * * * law" to determine whether it would be prudent to challenge the state's theory. *Krummacher*, 290 Or at 875.

In light of the foregoing, the state's argument on appeal that petitioner's trial attorney was not inadequate because the state's interpretation of ORS 163.305(4) (2007) was "reasonable" or "plausible" misses the mark. Even assuming, without agreeing, that the state's interpretation was reasonable or plausible, the issue is whether petitioner's counsel could have urged a different plausible interpretation that would have benefitted petitioner at trial. The answer is plainly yes.

We also conclude that, under the circumstances, the potential benefits of challenging the state's interpretation exceeded any risks. *Burdge*, 338 Or at 497. Because the state's theory of criminal liability was embedded in the language of the indictment itself, a successful motion for a directed verdict or for a judgment of acquittal would have resulted in the dismissal of Counts 2, 4, and 6. An unsuccessful motion would have presented no risk to petitioner. Those motions would have raised a pure question of law and would have been decided by the trial court. For all of those reasons, we conclude that petitioner's trial counsel failed to exercise reasonable professional skill and judgment by not challenging the state's construction of ORS 163.305(4).

We also conclude that, had petitioner's trial counsel challenged the state's interpretation of ORS 163.305(4), that challenge would have been successful. When interpreting a statute, we apply the framework established in *PGE*, 317 Or 606, and subsequently modified by *Gaines*, 346 Or 160. Under that framework, the goal of statutory interpretation is to discern the intent of the legislature that enacted the

statute. *Id.* at 171. The most persuasive evidence for determining the legislature's intent is the "text and context" of the statute itself. *Id.* A statutory term's "context" includes both its immediate context (the "phrase or sentence in which the term appears") and the "broader context," which includes other statutes "on the same subject." *State v. Stamper*, 197 Or App 413, 417-18, 106 P3d 172, *rev den*, 339 Or 230 (2005). We also will consider any "pertinent legislative history." *Gaines*, 346 Or at 172. If the legislature's intent remains unclear, we will resort to "general maxims of statutory construction." *Id.*

Here, the text of ORS 163.305(4) required the state to prove that a person was under the "influence of a controlled or other intoxicating substance" and that that substance was "administered to the person without the consent of the person." Thus, the statute refers to simple "consent." We typically assume that the legislature intends words of common usage to be "given their plain, natural, and ordinary meaning." *PGE*, 317 Or at 611. The ordinary meaning of "consent" is "to give express agreement." *Stamper*, 197 Or App at 417 (citing *Webster's Third New Int'l Dictionary* 482 (unabridged ed 2002)).

Nothing in the plain text or immediate context of the statute injects *capacity* to consent into the analysis. The state, however, cites *Stamper* for the proposition that "the word 'consent' includes both actual and legal capacity to consent." In *Stamper*, the defendant challenged his conviction for second-degree sexual abuse, the elements of which are set out in ORS 163.425. *Id.* at 415. Reviewing that conviction required us to interpret the statutory phrase "the victim does not consent thereto[.]" 197 Or App at 415. We interpreted that phrase with reference to "other related statutes" including ORS 163.315(1)(a), which provides that a person lacks the ability to consent to a sexual act if the person is "[u]nder 18 years of age[.]" Ultimately, we concluded that, with regard to ORS 163.425, "our best judgment is that the legislature intended the phrase 'the victim does not consent' to apply either to actual lack of consent or incapacity to consent because the victim was under the age of 18." *Id.* at 427.

Relying on *Stamper*, the state here cites several other statutes as "examples of instances in which 'consent' means more than actual acceptance or willingness." *See* ORS 163.315(1) ("A person is considered incapable of consenting to a sexual act if the person is * * * [u]nder 18 years of age[.]"); ORS 163.197(3) (providing that, for the purposes of the crime of hazing, the "[c]onsent of the person who is hazed is not a defense"); ORS 163.215(1) (in the context of kidnapping and related offenses, providing for an alternative definition of the term "without consent" when the victim "a person under 16 years of age or who is otherwise incapable of giving consent").

The statutes cited by the state do not aid our analysis. Although ORS 163.315 can be said to be "related" to ORS 163.305(4) in that both statutes deal with the subject of criminal sexual conduct, the other statutes on which the state relies are not related to ORS 163.305(4) in any meaningful sense. There is a problem with the state's reliance on ORS 163.315 as well. In drafting ORS 163.305(4), the legislature used the term "without the consent of the person" in reference to the phrase "a controlled or intoxicating substance [being] administered to the person." By contrast, ORS 163.315 does not use the term "consent" in reference to the consumption of intoxicating substances; ORS 163.315 deals with when "[a] person is considered incapable of consenting *to a sexual act.*" (Emphasis added.) Thus, the meaning of the term "consent" in ORS 163.315 does not help us to understand what the legislature intended the term "without the consent of the person" to mean in ORS 163.305(4). The immediate contexts in which those terms appear are simply too different. Because nothing convinces us otherwise, we assume that the legislature intended to give the term "consent," as it appears in ORS 163.315(4), its ordinary meaning. That is, we assume the legislature meant "to give express agreement." *Stamper*, 197 Or App at 417.

Having determined that the state's interpretation of ORS 163.305(4) was erroneous, we easily conclude that petitioner was prejudiced by his counsel's failure to challenge that interpretation. That failure allowed petitioner to be convicted on Counts 2, 4, and 6 when those counts should have been dismissed. Even if the trial court had accepted the

state's theory, petitioner's statutory construction argument would have been preserved and could have been brought before this court on direct appeal. Had that occurred, we would have done precisely what we do now; for the reasons set forth above, we would have concluded that the legislature intended the term "consent" in ORS 163.305(4) to have its ordinary meaning. We would, accordingly, have rejected the state's argument that absence of consent could be established by a victim's age alone.

B. *The Expert Medical Testimony*

In his first and second claims, petitioner alleged the following:

"1. Trial counsel failed to conduct a complete investigation into the medical evidence of a tear between [F's] hymen and her labia minora and failed to retain and consult with a qualified medical expert in order to prepare a defense and present evidence at trial on this issue.

"2. Trial counsel was not prepared to respond to the medical evidence of the reported tear between [F's] hymen and her labia minora and failed to effectively cross-examine the nurse, Kathy Wade, called as the state's medical witness regarding this evidence."

On appeal, the state does not challenge the post-conviction court's conclusion that petitioner's trial counsel was inadequate in both of those respects. Therefore, the only question before us is whether the post-conviction court erred when it found that petitioner had been prejudiced by his trial counsel's failures. For federal constitutional purposes, proving prejudice requires a petitioner to prove that it is "reasonably likely" that the result of the trial would have been different had counsel acted differently. *Harrington v. Richter*, 562 US 86, 131 S Ct 770, 792, 178 L Ed 2d 624 (2011) (citing *Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984)). Under the Oregon formulation, a defendant is prejudiced by his or her counsel's inadequate representation when the counsel's "acts or omissions * * * [had] a tendency to affect *the result* of the prosecution." *Krummacher*, 290 Or at 883 (emphasis added). "Whether a petitioner has demonstrated prejudice is a legal question" and answering it "may depend on the

post-conviction court's findings." *Logan v. State of Oregon*, 259 Or App 319, 327, 313 P3d 1128 (2013), *rev den*, 355 Or 142 (2014) (citing *Wyatt v. Czerniak*, 223 Or App 307, 311, 195 P3d 912 (2008)). We will defer to the post-conviction court's factual findings as long as they are supported by evidence in the record. *Logan*, 259 Or App at 327 (citing *Derschon v. Belleque*, 252 Or App 465, 466, 287 P3d 1189 (2012), *rev den*, 353 Or 208 (2013)).

We begin by noting that the post-conviction court's resolution of this issue has placed us in a tenuous position. Our standard for reviewing a decision by a post-conviction court requires us to give great deference to the court's factual findings; we are prohibited from reweighing the evidence in the record or speculating about "whether the evidence might have supported other factual findings than those made by the trial court." *Pratt v. Armenakis*, 201 Or App 217, 220, 118 P3d 821 (2005). Here, however, the post-conviction court entered a judgment that does not articulate the factual bases for its ultimate conclusion that petitioner was prejudiced. Rather, it merely refers us to the "findings on record." Moreover, the court's only express finding on the issue of prejudice appears to *reject* the idea that the Fitzgerald affidavit would have made any difference. In the course of granting petitioner relief, the post-conviction court explained:

> "I don't find the Fitzgerald affidavit very helpful, as I indicated earlier, because, you know, to me these cases, they boil down to if the jury believes the woman. Unless there's some gross findings of coaching or some other real possibility, rather than all the guesswork that goes into guessing about how else this injury could have occurred, juries just don't buy it.
>
> "And part of this is prejudice stuff. So, you know, I've really had difficulty around this, because there's no question in my mind that he should have consulted a medical expert and gotten prepared to testify. I think it's really a close question whether there's prejudice shown here.
>
> "I think since he so utterly failed, I think one has to come down on the side of prejudice, but that's a close question, quite frankly, I have to admit. So I think he's entitled

to prevail on Counts 1 and 2—Claims 1 and 2 in regard to not being prepared and adequately cross-examining the medical[.]"

In short, the post-conviction court concluded that petitioner had been prejudiced without linking that conclusion to the factual record. That makes it more challenging to review the court's decision in a way that gives appropriate deference to the court's factual findings. Accordingly, we begin our analysis by explaining certain principles that help to define the proper scope of review.

The first such principle is that, in the post-conviction context, "[t]he allegations of the petition frame the issues that a post-conviction court can consider, and a petitioner who fails to raise a claim in a petition for post-conviction relief has waived it and is foreclosed from making arguments on claims not raised in the petition." *Hale v. Belleque*, 255 Or App 653, 660, 298 P3d 596, *rev den*, 354 Or 597 (2013). Here, Claims 1 and 2 in petitioner's second-amended petition are specifically directed at "the *medical evidence* of a tear between [F's] hymen and her labia minora." (Emphasis added.) We, thus, confine the scope of our review of those portions of the record that are relevant to petitioner's claims about the medical evidence of the skin tear observed by Wade. During trial, Wade testified that her observation of that skin tear was "consistent" with the allegation that petitioner had penetrated F. Because we have already concluded that the post-conviction court did not err by granting petitioner relief on Counts 2, 4, and 6, the only remaining count that required the state to prove penetration is Count 7, which required the state to prove that petitioner subjected F to "sexual intercourse."[4]

The second principle is that, when a petitioner's claim for relief involves an argument about how a witness might have testified at trial, it is incumbent on the petitioner to provide "evidence by affidavit, testimony or otherwise as to what [the] testimony would have been so as to

---

[4] Count 8, the other count of sexual abuse in the second degree, alleged that petitioner subjected F to "deviate sexual intercourse," which is defined as "sexual conduct between persons consisting of contact between the sex organs of one person and the mouth or anus of another." ORS 163.305(1).

allow an evaluation of the likely effect of that testimony at trial." *Carias v. State of Oregon*, 148 Or App 540, 547, 941 P2d 571 (1997). Here, petitioner provided such evidence in the form of an affidavit by Fitzgerald.[5]

Fitzgerald's affidavit presents two categories of evidence that are relevant to the question before us. First, the affidavit suggests that, had petitioner's defense counsel obtained a qualified medical expert, that expert would have been able to testify that the trauma observed by Wade "could easily result from any number of causes, such as self-stimulation, sex play or wearing tight blue jeans with no underwear." Second, the affidavit claims that the medical evidence that Wade collected "was not properly documented and may not have been properly performed in accordance with the Oregon Sexual Assault Response Team [(SART)] protocols." According to Fitzgerald, those protocols "require a full-length, fully clothed photo of the patient for purposes of identification prior to commencing the actual examination, in addition to photographs of each and every identifiable injury to include a color reference scale and a measurement scale." Fitzgerald also averred that she would have also told petitioner's trial attorney to familiarize himself with the hospital's procedures for sexual assault exams.

As quoted above, the post-conviction court found that Fitzgerald's testimony about other possible causes for F's skin tear would not likely have made a difference to the jury. Evidence in the record supports that finding. Significantly, the Fitzgerald affidavit never claimed that an expert witness would have been able to testify that the skin tear observed by Wade could *not* have been caused by sexual intercourse. Moreover, Wade did acknowledge on cross-examination that an alternative explanation for F's skin tear was possible. Thus, because the jury had already been informed that the skin tear was not conclusive evidence of

---

[5] During the post-conviction relief hearing, the state challenged the admission of the Fitzgerald affidavit as well as an affidavit by attorney Ryan Scott. The post-conviction court ruled that portions of Scott's affidavit were inadmissible because Scott was not qualified as a medical expert. The court otherwise allowed the affidavits. Because the state does not assign error to that ruling, we do not address it on appeal. ORAP 5.45(1).

penetration, it was reasonable for the post-conviction court to conclude that additional testimony on that point would not have discredited Wade. We also note that calling an expert witness to testify on behalf of petitioner would not have been a risk-free proposition. As the original prosecuting attorney testified to the post-conviction court, she would have asked Fitzgerald "if it was possible that the victim's injury was caused by forcible sexual intercourse, and she would be forced to concede that it was at least possible." The force of that concession may very well have ended up harming petitioner.

As to the second subject covered in Fitzgerald's affidavit—Wade's documentation of F's injuries—the post-conviction court made no explicit findings. Consistently with our standard of review, we presume that the court made findings with respect to the weight of that evidence that were consistent with its ultimate conclusion. *Chew v. State of Oregon*, 121 Or App 474, 476-77, 855 P2d 1120, *rev den*, 318 Or 24 (1993). That is, we assume that the trial court found that a more effective critique of Wade's examination procedures would have been helpful to petitioner. Turning to the question of whether there is evidence to support that implicit finding, we consider specifically whether there is evidence of how Wade *would* have testified had she been cross-examined in the manner in which Fitzgerald suggested. *Carias*, 148 Or App at 547.

Petitioner did not take Wade's deposition in order to ascertain what her responses to those questions might have been. The issue, therefore, is whether there is evidence in Fitzgerald's affidavit that permits a reasonable inference about how Wade would have responded to Fitzgerald's suggested cross-examination strategies. With respect to whether Wade's examination was done in accordance with SART protocols, it is not possible to infer that Wade would have given answers that would have been helpful to petitioner. Rather, the record indicates that medical guidelines at the time specifically provided that alternative methods of documenting injuries include "careful drawings using body diagrams." Attorney General's Sexual Assault Task Force, *SART Handbook* 81 (2006).

The record does indicate that St. Charles Hospital's own procedures for sexual assault examinations contemplate photographic documentation.[6] The evidence in this case, however, does not permit an assumption that a cross-examination highlighting that fact would have been helpful to petitioner. Notably, Wade testified that she initially attempted to photograph F's injuries and that the camera failed, so she decided to document her observations by diagramming F's injuries by hand. Petitioner presented no evidence that that was an unreasonable decision under the circumstances.[7] Moreover, although the Fitzgerald affidavit asserts that the lack of photographic documentation made it "impossible * * * to properly verify or rebut Ms. Wade's testimony," Fitzgerald was still able to opine later in her affidavit that Wade's description of F's injury would have enabled a medical expert to testify that there were plausible alternative explanations for the skin tear other than sexual penetration. Fitzgerald does not explain how Wade's decision to diagram, rather than photograph, F's injuries affected the *integrity* of Wade's examination in this case. And the record is also silent as to what information, if any, could be gleaned from a photograph of F's injury that could not be gleaned from Wade's diagram and description.

To illustrate the point, we turn to a case relied upon by petitioner. Although that case, *State v. Hites-Clabaugh*, 251 Or App 255, 283 P3d 402 (2012), is not a post-conviction relief case, its analysis of a claim about erroneously excluded expert testimony is relevant here. In *Hites-Clabaugh*, the investigators who interviewed the alleged victim had failed

---

[6] Those hospital procedures provide, in pertinent part,

"4. Physical exam—Victims of sexual assault are assessed for actual and potential injuries secondary to the assault, based on history given or complaints of discomfort. ER physician will be consulted as needed for injuries that may warrant X-rays or are of concern to the SANE.

"a. Any case in which there is reported or suspected physical abuse, the ER physician will be consulted and requested to conduct a medical exam.

"b. Photographs will be taken with 35mm or Polaroid camera of all injuries identified during the exam

"c. Colposcope photographs of genitalia are taken by the SANE nurse."

[7] For example, although Fitzgerald's affidavit speculates that the hospital probably had other cameras available, there is no evidence in the record that that was so.

to follow "the child abuse investigation protocols * * * adopted by Marion County's multidisciplinary child abuse team and * * * promulgated by the Oregon Department of Justice." 251 Or App at 262. At trial, the defendant attempted to call a psychologist as an expert witness. *Id.* at 259. The state objected and, in accordance with OEC 103(1)(b), the defendant made an offer of proof. The defendant stated that the psychologist was prepared to testify "as an expert on the necessity to use protocols that have been promulgated by the State of Oregon in sex abuse cases." *Id.* at 262. The trial court excluded the testimony, in part, because it reasoned that the failure to follow those protocols was not a proper topic for expert testimony. *Id.* at 260. The court further explained that, "if counsel could provide statutory authority for the use of the protocols in question, then it would consider giving a jury instruction concerning them." *Id.* On appeal, we concluded that that exclusion was reversible error. We reasoned that the

> "defendant was entitled to present evidence not only of the existence and details of those protocols, but also to adduce expert testimony concerning *why* adherence to such protocols is important. To the extent that the trial court excluded the proffered evidence on the ground that the subject could be addressed by means of a jury instruction, but not evidence, the court erred."

*Id.* at 266 (emphasis in original).

In short, one of the critical factors in *Hites-Clabaugh* was that the excluded expert testimony would have helped the jury understand the importance of adherence to the protocols. That is not to say that a petitioner must always present such evidence. We conclude only that, in this case, petitioner had to do more than simply present evidence that Wade departed from her hospital's policy regarding photographs. That is so because the record demonstrates that Wade had a ready response: the camera did not work. Thus, to permit a reasonable inference that cross-examining Wade about the hospital's investigatory protocols would have yielded responses that were helpful to petitioner's case, petitioner was required to present some evidence suggesting that Wade's decision was unreasonable given the circumstances. He failed to do so.

In short, the record does not support a finding—if the post-conviction court indeed made it—that petitioner would have benefitted at trial by cross-examination of Wade regarding the hospital's protocols. Moreover, other findings made by the post-conviction court (specifically, the explicit finding that the court did not "find the Fitzgerald affidavit very helpful") militate against a conclusion of prejudice, rather than for it. Accordingly, we conclude that the trial court's legal conclusion that petitioner was prejudiced was not supported by evidence in the record. Thus, the post-conviction court erred in concluding that petitioner demonstrated that his trial counsel's failures alleged in Claims 1 and 2 had the tendency to affect the outcome of the prosecution. For purposes of petitioner's federal constitutional claims, we also conclude that the evidence in the record does not support a determination that it was "reasonably likely" that the result of petitioner's trial would have been different.

### C.  *Disposition*

A petitioner is entitled to have a conviction reversed only after demonstrating that his or her trial counsel was constitutionally inadequate and that counsel's failure "had a tendency to affect the result of his trial." *Lichau*, 333 Or at 359. A necessary corollary to that rule is that, when a petitioner is convicted of multiple counts, a petitioner is not entitled to relief on those counts that his or her counsel's constitutional inadequacy had no tendency to affect. *Galloway v. Nooth*, 247 Or App 164, 186, 268 P3d 736 (2011). Here, petitioner was convicted of seven counts: one count of first-degree rape (Count 2), one count of first-degree sodomy (Count 4), one count of first-degree sexual abuse (Count 6), two counts of second-degree sexual abuse (Counts 7 and 8), and two counts of furnishing alcohol to a minor (Counts 9 and 10). The jury found petitioner not guilty of Counts 1, 3, and 5. As explained above, the post-conviction court correctly ruled that petitioner was denied effective assistance of counsel when his trial attorney failed to challenge the state's interpretation of "mentally incapacitated" in ORS 163.305(4). We disagree, however, with the court's similar conclusion with regard to the trial attorney's failure to more thoroughly prepare for and cross-examine the state's medical expert.

The state argues that, under those circumstances, only the convictions for Counts 2, 4, and 6 should be reversed because the remaining counts were unaffected by the "mentally incapacitated" error. Petitioner counters that the state failed to preserve the argument that a new trial is required only for some counts, not all counts on which petitioner was convicted. We disagree. At the close of petitioner's post-conviction relief hearing, the parties and the court held an extended discussion about how to properly dispose of the case. It is clear from the transcript that all of the parties understood that petitioner's argument regarding the "mentally incapacitated" issue applied only to Counts 2, 4, and 6.[8] The state made that point both in its memorandum and during the hearing. In short, because the state clearly raised, and the trial court clearly considered, the argument that the "mentally incapacitated" issue applied only to Counts 2, 4, and 6, we conclude that that issue was preserved. *See State v. Merrick*, 224 Or App 471, 472, 197 P3d 624 (2008).

## III.   CONCLUSION

The post-conviction court correctly ruled that petitioner's trial attorney failed to exercise reasonable professional skill and judgment by not challenging the state's statutory interpretation of the term "mentally incapacitated." We also agree with the post-conviction court that petitioner was prejudiced by his trial attorney's failure to do so. Accordingly, we affirm that portion of the judgment that reversed the convictions on Counts 2, 4, and 6. As to Counts 7 and 8, however, we conclude that the record does not support the post-conviction court's conclusion that petitioner was prejudiced by any failure to more thoroughly cross-examine the nurse who examined F after the attack. In addition, there was no showing that the two counts of conviction for furnishing alcohol to a minor (Counts 9 and

---

[8] For example, during the discussions about the proper disposition, the trial court stated:

"'I've said, okay, you win on *the statutory interpretation stuff, and that, we know, covers 2, 4 and 6,* I think it is, but do we need to define what counts are affected by the medical testimony, because, you know, obviously I'm going to reverse and remand for trial, and am I reversing and remanding 2 and 7 based upon the medical?"

(Emphasis added.)

10) were (or could have been) affected by any alleged inadequacy of counsel. Accordingly, we reverse that portion of the judgment that reversed petitioner's convictions on Counts 7, 8, 9, and 10.

Portion of judgment reversing petitioner's convictions on Counts 7, 8, 9, and 10 reversed; otherwise affirmed.