Argued and submitted April 13, 2015, affirmed on appeal and cross-appeal April 20, Richardson's petition for review denied, Belleque's petition for review allowed August 4, 2016 (360 Or 235)

CHARLES EDWARD RICHARDSON,
*Petitioner-Respondent*
*Cross-Appellant,*

*v.*

Brian BELLEQUE,
Superintendent,
Oregon State Penitentiary,
*Defendant-Appellant*
*Cross-Respondent.*

Marion County Circuit Court
09C20407; A151817

373 P3d 1113

Patrick M. Ebbett, Assistant Attorney General, argued the cause for appellant-cross-respondent. With him on the opening brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General. With him on the reply-cross-answering brief were Ellen

F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Jason Weber argued the cause and filed the brief for respondent-cross-appellant.

Charles Edward Richardson filed the supplemental brief *pro se.*

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Egan, Judge.*

EGAN, J.

---

* Hadlock, C. J., *vice* Nakamoto, J. pro tempore.

**EGAN, J.**

This is a post-conviction case in which the court vacated petitioner's sentence on the basis of inadequate assistance of trial counsel, under Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution, and remanded the case for resentencing. The state[1] appeals, arguing that the post-conviction court erred in determining that counsel was inadequate for failing to consult with or call an expert witness at petitioner's dangerous-offender sentencing hearing. Petitioner cross-appeals, contending that the post-conviction court erred in determining that counsel was not inadequate during the guilt phase of petitioner's trial, and that appellate counsel was not inadequate on direct appeal. We agree with the post-conviction court's determination that petitioner was denied adequate representation at sentencing, and that he was prejudiced as a result. We reject without written discussion petitioner's claims on cross-appeal, including his *pro se* supplemental claims. Accordingly, we affirm on both the appeal and cross-appeal.

ORS 138.530(1)(a) provides for post-conviction relief when there has been a "substantial denial in the proceedings resulting in petitioner's conviction * * * of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." A criminal defendant is guaranteed the right to adequate assistance of counsel under Article I, section 11, and the Sixth Amendment. *Montez v. Czerniak*, 355 Or 1, 6, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014); *Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (United States Constitution requires the "effective" assistance of counsel). We review the post-conviction court's determination that petitioner was denied adequate assistance of counsel for legal error. ORS 138.220; *Montez*, 355 Or at 8. In doing so, however, we are bound by the post-conviction court's findings of fact if they are supported by evidence in the record. *Id.* (citing *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002)). Moreover,

---

[1] For clarity, we refer to defendant as "the state" throughout this opinion.

"[i]f the post-conviction court failed to make findings of fact on all the issues—and there is evidence from which such facts could be decided more than one way—we will presume that the facts were decided consistent with the post-conviction court's conclusions of law." *Id.*

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Underlying Criminal Proceedings*

In 2006, petitioner was indicted on charges of first-degree manslaughter and second-degree assault. Those charges stemmed from an incident that occurred at the Prairie Schooner, a tavern outside of Eugene. While at that bar, petitioner and his wife quarreled and petitioner walked out the back door to work on his truck. Petitioner later returned, exchanged words with his wife, and then left, slamming the door on his way out. This drew the attention of the victim, an elderly man, who followed petitioner out the door.

After the victim stepped outside, petitioner punched him, causing him to fall. Petitioner then walked back into the bar and told his wife to leave with him. Petitioner and his wife left by the same door, walking by the victim as they departed. The victim suffered a massive head injury and died the next day.

Petitioner was convicted of both charges after a jury trial, and the state sought a dangerous-offender sentence pursuant to ORS 161.725 and ORS 161.735.[2]

---

[2] ORS 161.725 provides, in part:

"(1) Subject to the provisions of ORS 161.737, the maximum term of an indeterminate sentence of imprisonment for a dangerous offender is 30 years, if because of the dangerousness of the defendant an extended period of confined correctional treatment or custody is required for the protection of the public and one or more of the following grounds exist:

"(a) The defendant is being sentenced for a Class A felony and the defendant is suffering from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another."

ORS 161.735 provides, in part:

"(1) Upon motion of the district attorney, and if, in the opinion of the court, there is reason to believe that the defendant falls within ORS 161.725, the court shall order a presentence investigation and an examination by a psychiatrist or psychologist. The court may appoint one or more qualified

## B. *The Presentence Hearing*

Prior to the presentence hearing, petitioner was examined by Dr. Suckow, the state's psychiatrist. In his report submitted to the court, Suckow diagnosed petitioner with an antisocial personality disorder.

At the presentence hearing, which was held before a jury, Suckow testified consistently with his written report. He testified that his diagnosis of antisocial personality disorder was based on an interview with petitioner, as well as investigation reports about the manslaughter and petitioner's criminal history. Suckow noted that petitioner had been made a ward of the court by age 12, when he was sent to St. Mary's Home for Boys (St. Mary's). He recounted petitioner's extensive history of being in and out of custody as a juvenile. Suckow also described petitioner's adult criminal history. Finally, Suckow testified that petitioner was "considered [to have suffered from] a conduct disorder before the age of 15."

Suckow described for the jury the behavior of people who suffer from an antisocial personality disorder. He testified that people with the condition are not likely to improve easily with treatment and fail to comply with social norms. Suckow stated:

"People [with antisocial personality disorder] are normal except they seem to do things that are wrong and they have little regard for the rights of others; they tend to pay no attention to what is good for the other person; it's just whatever meets their needs. If making you happy is part of that, they will do that. They will make you unhappy, too. But

psychiatrists or psychologists to examine the defendant in the local correctional facility.

"* * * * *

"(5) Upon receipt of the examination and presentence reports the court shall set a time for a presentence hearing, unless the district attorney and the defendant waive the hearing. At the presentence hearing the district attorney and the defendant may question any psychiatrist or psychologist who examined the defendant pursuant to this section.

"(6) If, after considering the evidence in the case or in the presentence hearing, the jury or, if the defendant waives the right to a jury trial, the court finds that the defendant comes within ORS 161.725, the court may sentence the defendant as a dangerous offender."

they don't really have much concern for it. And it starts in early childhood."

Petitioner's counsel cross-examined Suckow about his diagnosis. Counsel challenged Suckow on the lack of evidence that petitioner suffered from a conduct disorder before age 15—one of the criteria for a personality disorder diagnosis outlined in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed Text Revision 2000) (DSM-IV-TR).[3] Suckow conceded that he could not definitively identify evidence that three of the behavioral criteria of a conduct disorder had been satisfied. Instead, he testified that he believed certain criteria existed based on indirect evidence, such as his belief that petitioner had initiated fights and was cruel because "[he couldn't] imagine [petitioner] being in all those fights without some of that." Suckow also believed that petitioner was deceitful before age 14 and that "[d]eceitfulness runs through his life," thus providing further indirect evidence to support his diagnosis.

On redirect, Suckow testified that an antisocial personality disorder diagnosis does not require a diagnosis of conduct disorder before age 15, but rather "evidence of" a conduct disorder. Suckow then recounted an incident that he had witnessed during which petitioner physically resisted jail deputies' efforts to remove a ring on his finger, forcing them to take him to the ground, and testified that the incident supported his diagnosis of an antisocial personality disorder.

The prosecutor also presented evidence of petitioner's violent behavior through civilian and police witnesses, and offered 12 exhibits detailing petitioner's criminal history. That history included convictions for fourth-degree assault (in 1978), second-degree robbery (in 1978), second-degree assault (in 1978), two counts of second-degree assault (in 1986), aggravated first-degree theft (in 1997), two counts of unlawful use of a vehicle (in 1997), attempted second-degree assault (in 1997), attempted assault on a public safety officer (in 1997), assault on a public safety officer (in 2005), and

---

[3] The revised fourth edition of the *Diagnostic and Statistical Manual of Mental Disorders* was the version relied upon during Suckow's testimony and is thus the version relied on throughout this opinion.

possession of a controlled substance (for which petitioner was on probation at the time of the first-degree manslaughter charge). The prosecutor explained to the jury that the gaps in petitioner's criminal history coincided with petitioner's major prison sentences. In closing argument, the prosecutor argued that no medical diagnosis was required for the jury to make a finding that petitioner was a dangerous offender.

Petitioner presented testimony from his wife, who described petitioner as a skilled barber, musician, community volunteer, and devout Catholic who never smokes and rarely drinks. Petitioner's counsel argued to the jury that the state had not established that petitioner suffered from a "severe personality disorder," focusing on the weakness of Suckow's diagnosis and arguing that the diagnosis was inaccurate because Suckow could not make a finding that petitioner suffered from a conduct disorder prior to age 15.

The jury found that petitioner qualified as a dangerous offender. The trial court adopted that finding and sentenced petitioner to a minimum sentence of 260 months' imprisonment under the dangerous-offender sentencing guidelines.

Petitioner appealed, and we affirmed his conviction without written opinion. *State v. Richardson*, 226 Or App 85, 202 P3d 290, *rev den*, 346 Or 213 (2009).

C. *The Post-Conviction Proceeding*

Petitioner subsequently filed a timely petition for post-conviction relief, arguing that his trial attorney was inadequate during both the guilt and penalty phases of his trial. Petitioner claimed, *inter alia*, that counsel was inadequate at sentencing for a number of reasons, including that counsel failed to consult with and call an expert psychologist to rebut Suckow's testimony that petitioner suffered from an antisocial personality disorder. Petitioner alleged:

> "Defense counsel failed to conduct an investigation to support his decision not to obtain a defense psychological evaluation of petitioner to rebut testimony by prosecution expert, Dr. George Suckow, that petitioner suffered from an antisocial personality disorder. A defense psychologist would have provided testimony that petitioner does not

meet the diagnostic criteria for an antisocial personality disorder and that petitioner did not suffer from a severe personality disorder. As a result of counsel's failure to retain a defense psychologist the jury relied exclusively upon the testimony of Dr. Suckow to determine that petitioner did suffer from a severe personality disorder. Petitioner was thereafter sentenced as a dangerous offender under ORS 161.725. An attorney exercising reasonable professional skill and judgment would have retained a psychologist for the reasons outline above."

Petitioner presented 13 exhibits at the post-conviction trial, including a deposition from James Jagger, petitioner's trial counsel, and a report from Dr. Norvin Cooley, a clinical psychologist. In his deposition, counsel stated that he could not recall whether he had consulted a mental health expert prior to the presentence hearing, but that he did not think that he had. He stated that, in the past, he had used experts to challenge the state's evidence in support of a dangerous-offender sentence, and that he typically makes the determination whether to use an expert on a case-by-case basis. Counsel asserted that he decides whether to use an expert based on his review of the state's psychological evaluation and the facts of the case. Sometimes he proceeds based only on the report of the state's expert when he thinks he "can make better hay with what [the prosecution has]" than by "confusing things by having [his] own expert." He also stated that there are "situations where you don't call one, don't have one, review one, because I, in some respects [would] be conceding particular elements." In this case, he "did not think that there was any benefit to actually hir[ing] someone to do an evaluation," because he "didn't think it was going to get [the defense] any help at all."

Cooley prepared his report after conducting two intellectual and personality tests of petitioner, and reviewing the presentence investigation report, petitioner's records from St. Mary's, Suckow's report, Suckow's testimony at the presentence hearing, and the closing arguments of the prosecution and defense at the presentence hearing. Cooley stated that he and "numerous other psychologists" in Oregon would have been available as experts who could have been hired by the defense. He explained that "[s]uch an expert

would have been qualified to evaluate and diagnose whether or not [petitioner] suffers from a personality disorder, specifically an antisocial personality disorder."

In conducting his evaluation, Cooley opined that petitioner did not suffer from an antisocial personality disorder, which he asserted required a finding that petitioner had a conduct disorder before age 15. Rather, petitioner's juvenile mental health records indicated that he suffered from an adjustment disorder. The reports indicated that petitioner's mother was abusive and might be the source of petitioner's problems. Petitioner had run away from home several times, and was physically punished by his mother when he was found. While he was at St. Mary's, petitioner was described as "moody, dissatisfied, and unhappy." Before his placement at the home, petitioner was evaluated by a psychiatrist who opined that petitioner was "a seriously disturbed youngster whose feelings of ambivalence are of such magnitude and degree that he is unable to control those feelings in relationship to his mother." The psychiatrist categorized petitioner as "demonstrating an adjustment reaction of early adolescence with behavior disturbance, severe." Another psychological evaluation noted that petitioner was "very resistant to authority and noted if he was able to form a close relationship with his counselor his prognosis [was] good." That report stated that petitioner's mother "[made] it difficult to control her boy for she may side with him against legitimate authority."

Cooley criticized Suckow's evaluation on the basis that Suckow had not reviewed petitioner's juvenile mental health records. Cooley stated that an antisocial personality disorder diagnosis requires that an individual must "demonstrate a conduct disorder before the age of 15." Petitioner's records did not demonstrate a conduct disorder, but rather revealed that he suffered from an adjustment disorder. Cooley concluded that "a dangerous offender designation is reserved for those who meet the criteria of a severe personality disorder which indicates a propensity toward crimes that seriously endanger the life and safety of others, that the personality disorder generally referred to by that statute is an antisocial personality disorder, and that it was not

possible based on the available data to conclude that [petitioner] demonstrates the symptoms and behaviors consistent with the diagnosis of antisocial personality disorder."

The post-conviction court denied petitioner relief on his claims that trial counsel was inadequate during the guilt phase of the underlying trial and that appellate counsel was inadequate on appeal. However, the court granted petitioner relief on his claim that counsel was inadequate during the sentencing phase of the trial. Specifically, the post-conviction court ruled:

"5. Ct does find inadequacy and prejudice in jury sentencing phase.

"A. Pet found to be dangerous offender + ct sentenced as d.o., largely based on D.A.'s expert, Dr. Suckow. Trial att did not consult or call an expert. Suckow found that pet had a personality disorder (written report says severe) which requires an underlying diagnosis of conduct disorder which in turn requires onset before age 15. He did not have pet's juvenile records from St. Mary's that contain a diagnosis of adjustment reactive disorder not conduct disorder. This court agrees with att that an expert witness is not always required. Att. did an excellent job impeaching Suckow based on whether or not there was a valid diagnosis of conduct disorder, but was unable by using cross, to bring in the key issue of the prior diagnosis of adjustment disorder—a diagnosis that would disqualify for dang. off. Dr. Cooley would have added facts that were not flattering to pet but that could have been explained by the adj. disorder diagnosis. That diagnosis would also allow att to bring in details of pet's upbringing that were relevant and unknown to Suckow. That diagnosis might well lead a court to impose a maximum guideline sentence but would not have, if believed by the jury, have allowed a d.o. sentence.

"The sentence is vacated and the matter returned to the sentencing court for a new sentencing."

The state challenges that decision on appeal, arguing that counsel's representation was not inadequate and that petitioner did not suffer prejudice as a result of his attorney's decision not to consult an expert psychologist. For the reasons that follow, we reject the state's arguments and affirm the post-conviction court's judgment.

## II. ANALYSIS

In *Montez*, the Supreme Court emphasized that "the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution." 355 Or at 6-7. However, we first consider the state constitutional claim, and, "[i]f the petitioner prevails under Article I, section 11, we do not consider his claims under the Sixth Amendment." *Id.* at 7 n 3.

Under the Oregon Constitution, we proceed in two steps when determining whether counsel has provided inadequate representation: A petitioner "must prove that his or her trial counsel failed to exercise reasonable professional skill and judgment and that, because of that failure, the petitioner suffered prejudice." *Pereida-Alba v. Coursey*, 356 Or 654, 661-62, 342 P3d 70 (2015). Prejudice means that counsel's failure had "'a tendency to affect the result of the prosecution.'" *Lichau*, 333 Or at 365 (quoting *Krummacher v. Gierloff*, 290 Or 867, 883, 627 P2d 458 (1981)).

The post-conviction court determined that counsel provided inadequate representation at the presentence hearing by failing to consult with or present an expert witness to rebut Suckow's testimony that petitioner had an antisocial personality disorder. The state assigns error to that ruling, arguing that counsel's decision not to call an expert, but rather to attack Suckow's diagnosis through effective cross-examination, was a reasonable tactical decision that should not be second-guessed on post-conviction review. The state posits that, to the contrary, the decision *to* call an expert like Cooley would have been inadequate because Cooley's report only served to strengthen the prosecution's position that petitioner was a dangerous offender. Thus, the state argues that the post-conviction court erred in granting petitioner relief and remanding the case for resentencing. We disagree.

"'[A]dequate' assistance requires an attorney to 'investigate the facts and * * * law to the extent appropriate to the nature and complexity of the case so that [counsel] is equipped to advise his [or her] client, exercise professional

judgment[,] and represent the defendant in an informed manner.'" *Burcham v. Franke*, 265 Or App 300, 306, 335 P3d 298 (2014) (quoting *Krummacher*, 290 Or at 875 (brackets in *Burcham*)).

> "[T]he failure to consider an issue or undertake a particular investigation does not automatically constitute inadequate assistance. However, the absence of strategic thought or direction on the part of a defense team can constitute inadequate assistance.
>
> "As *Montez* explains, whether the failure to consider an issue constitutes inadequate assistance will turn on, among other things, whether the strategy that defense counsel did employ was reasonable, the relationship between the evidence or theory that defense counsel failed to consider and the strategy that counsel did pursue, and the extent to which counsel should have been aware of the strategy that petitioner now identifies."

*Pereida-Alba*, 356 Or at 674 (internal citations and quotations omitted).

Contrary to the state's argument, counsel's decision not to consult an expert psychologist to rebut Suckow's diagnosis was not a reasonable defense strategy deserving of deference. As the Supreme Court has held, "tactical decisions made in the course of preparing for trial must involve 'a conscious choice by a lawyer either to take or to omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors.'" *Lichau*, 333 Or at 360 (quoting *Stevens v. State of Oregon*, 322 Or 101, 109, 902 P2d 1137 (1995)). Tactical decisions "must be grounded on a reasonable investigation." *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001). "The question in each case is whether trial counsel's investigation was legally and factually appropriate to the case." *Id.* (citing *Stevens*, 322 Or at 108).

Here, the record demonstrates that counsel made his decision to challenge Suckow's testimony solely through cross-examination without properly investigating alternative defense strategies. In his deposition, counsel stated that he prepared for the presentence hearing by reviewing

Suckow's report and the facts of petitioner's case. He stated that he did not consult an expert psychologist because he "did not think there was any benefit to actually hir[ing] someone to do an evaluation" and he "didn't think it was going to get [the defense] any help at all." Thus, the record demonstrates that counsel did not choose cross-examination as a defense strategy after adequately evaluating his options. Rather, he chose that strategy without knowing what a competing expert could provide to the defense. Counsel's choice "to limit his investigation in that way was not 'based on a reasonable evaluation of the likely costs and potential benefits' to petitioner." *Lichau*, 333 Or at 361 (quoting *Stevens*, 322 Or at 109). Rather, counsel made his decision without due diligence towards being informed of other defense strategies. *See Johnson v. Premo*, 277 Or App 225, 238-39, 370 P3d 553 (2016) (trial counsel limited the universe of options by not consulting an expert toxicologist, thereby making the choice of defense without informed due diligence). Accordingly, we conclude that counsel failed to exercise reasonable professional skill and judgment in not consulting with an expert psychologist prior to petitioner's presentence hearing, and therefore we affirm the post-conviction court's determination that counsel's performance was inadequate. *See Pereida-Alba*, 356 Or at 661-62.

We also agree with the post-conviction court's determination that petitioner was prejudiced by his attorney's inadequacy. To demonstrate prejudice, a petitioner must show that counsel's failure had "a tendency to affect the result of the prosecution." *Lichau*, 333 Or at 365 (internal quotation omitted). The state argues that petitioner was not prejudiced here because counsel effectively challenged Suckow's diagnosis through cross-examination, and thus there was no need for him to present the jury with a competing expert opinion. The state argues further that Cooley's testimony would not have helped petitioner at the presentence hearing and would actually have been detrimental to petitioner's defense. Again, we disagree.

The post-conviction court expressly found that, although counsel "did an excellent job impeaching Suckow," he was "unable by using cross, to bring in the key issue of

the prior diagnosis of adjustment disorder[.]" That finding is supported by the evidence, and thus we are bound by it. *Montez*, 355 Or at 8. Like Suckow, counsel did not possess petitioner's juvenile mental health records from St. Mary's, which revealed that petitioner had been diagnosed with an adjustment disorder prior to age 15. During cross-examination, counsel did not question Suckow about adjustment disorders or ask Suckow whether the evidence suggested that petitioner suffered from an adjustment disorder rather than a conduct disorder. Thus, although counsel was able to challenge Suckow's diagnosis by highlighting a lack of evidence of a conduct disorder prior to age 15, he was unable during cross-examination to elicit testimony that petitioner might actually have suffered from an adjustment disorder.

We agree with the post-conviction court that the failure to present evidence that petitioner suffered from an adjustment disorder, rather than a conduct disorder, prior to age 15 was prejudicial to petitioner. ORS 161.725(1)(a) authorizes a court to sentence a defendant to a maximum term of imprisonment of 30 years if "[t]he defendant is being sentenced for a Class A felony and the defendant is suffering from a *severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another.*" (Emphasis added.) The state correctly notes that such determination does not depend on any particular diagnosis by an examining psychiatrist or psychologist. *See, e.g., State v. Trice*, 146 Or App 15, 24, 933 P2d 345 (1997) ("[T]he essence of the dangerous offender classification is not one specific diagnosis, but any significant mental or emotional disorder or disturbance—a lay concept—and that finding should be based on the [factfinder's] evaluation of all the information gathered[.]" (Internal quotation and emphasis omitted.)). However, where a psychologist has offered a specific diagnosis of antisocial personality disorder, it is reasonable to infer that the jury relied on that diagnosis in making its dangerous-offender finding.

Here, it is likely that the jury relied on Suckow's testimony in finding that petitioner had a severe personality disorder indicating a propensity toward violent crimes.

According to the DSM-IV-TR, an antisocial personality disorder is "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." DSM-IV-TR at 701. Antisocial personality disorders require a finding that an individual has had some symptoms of conduct disorder before age 15. "Conduct disorder" involves

> "a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated. The specific behaviors characteristic of Conduct Disorder fall into one of four categories: aggression to people and animals, destruction of property, deceitfulness or theft, or serious violation of rules."

DSM-IV-TR at 702. Based on Suckow's diagnosis and petitioner's violent criminal history, the jury could reasonably find that petitioner exhibited a pervasive disregard for the rights of others through aggression to other people, and thus a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another.

Cooley's report, on the other hand, revealed that prior to age 15, petitioner had been diagnosed with an adjustment disorder.

> "The essential feature of an Adjustment Disorder is a psychological response to an identifiable stressor or stressors that results in the development of clinically significant emotional or behavioral symptoms. \* \* \*. By definition, an Adjustment Disorder must resolve within 6 months of the termination of the stressor (or its consequences) \* \* \*. However, the symptoms may persist for a prolonged period (*i.e.*, longer than 6 months) if they occur in response to a chronic stressor \* \* \*."

DSM-IV-TR at 679. Unlike a conduct disorder, an adjustment disorder does not typically persist when the significant stressor is removed. Had the jury accepted Cooley's testimony over Suckow's, it could have found that a diagnosis of an antisocial personality disorder was unavailable. In that case, the jury might not have found that petitioner had a "severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another" or that petitioner's mental health rendered him a dangerous offender.

We reject the state's argument that Cooley's testimony would not have helped petitioner at the presentence hearing and would actually have been harmful to his defense. The post-conviction court expressly found that, although "Cooley would have added facts that were not flattering to [petitioner]," those facts "could have been explained by the [adjustment] disorder diagnosis." In other words, counsel could have argued—consistently with Cooley's report—that petitioner's aggressive and impulsive behavior as a child was likely the result of having been raised in an abusive household. Petitioner was simply reacting to the stressor of his mother's abusive behavior. Thus, even if those facts cast petitioner in a negative light, they do not contradict Cooley's ultimate opinion that petitioner did not suffer from an antisocial personality disorder. Had the jury accepted Cooley's opinion over Suckow's, the negative information about petitioner's past would not necessarily have led to the conclusion that petitioner suffered from a "severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another." Thus, the post-conviction court correctly determined that Cooley's testimony would have had a tendency to affect the result of the sentencing. *Lichau*, 333 Or at 365.

Affirmed on appeal and cross-appeal.