236 December 14, 2017 No. 65

IN THE SUPREME COURT OF THE
STATE OF OREGON

CHARLES EDWARD RICHARDSON,
*Respondent on Review,*

*v.*

Brian BELLEQUE,
Superintendent,
Oregon State Penitentiary,
*Petitioner on Review.*

(CC 09C20407; CA A151817; SC S064185)

On review from the Court of Appeals.*

Argued and submitted January 12, 2017.

Patrick M. Ebbett, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General and Frederick M. Boss, Deputy Attorney General.

Jason Weber, O'Connor Weber LLC, Portland, argued the cause and filed the brief for respondent on review.

Dennis N. Balske and Jeffrey Erwin Ellis, Portland, filed the brief for *amicus curiae* Oregon Criminal Defense Lawyers Association.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Nakamoto, and Flynn, Justices.**

NAKAMOTO, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

\* On appeal from Marion County Circuit Court, Linda L. Bergman, Senior Judge. 277 Or App 615, 373 P3d 1113 (2016).

\*\* Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case. Brewer, J., retired June 30, 2017, and did not participate in the decision of this case. Duncan, J., did not participate in the consideration or decision of this case.

**NAKAMOTO, J.**

In this action for post-conviction relief, petitioner successfully contended that his defense counsel had rendered constitutionally inadequate representation during a presentence hearing concerning whether petitioner was a dangerous offender who suffered from a "severe personality disorder" as provided in ORS 161.725(1)(a). Petitioner's defense counsel cross-examined the psychiatrist who testified for the state, but counsel had not investigated significant records regarding petitioner's background or consulted with an expert before the hearing, nor did he introduce evidence from a defense expert at the hearing. The jury found that petitioner suffered from a severe personality disorder, and the trial court sentenced petitioner to a lengthy prison term as a dangerous offender.

The post-conviction court concluded that defense counsel had provided inadequate assistance by failing (1) to reasonably investigate and to consult with an expert before deciding that cross-examination alone was appropriate and (2) to present testimony from a defense expert to rebut the psychiatrist's testimony that petitioner had an antisocial personality disorder. After concluding that petitioner had been prejudiced as a result, it vacated petitioner's dangerous-offender sentence and remanded the case for resentencing. The Court of Appeals affirmed based on one of the post-conviction court's conclusions: that defense counsel had provided inadequate assistance through failure to investigate and consult an expert and that petitioner suffered prejudice as a result. *Richardson v. Belleque*, 277 Or App 615, 627-29, 373 P3d 1113 (2016).

On review, the state[1] argues that the Court of Appeals erred for two alternative reasons: (1) defense counsel made a reasonable tactical decision to rely on cross-examination without consulting an expert and (2) regardless, petitioner did not establish the required prejudice, which the state describes as a showing that, but for the deficient representation, it was "reasonably probable" that the

---

[1] We refer to defendant Belleque, the Superintendent of the Oregon State Penitentiary, as "the state" for ease of reference.

outcome of the sentencing phase of trial "would have been different."

As did the Court of Appeals, we conclude that defense counsel rendered inadequate assistance by failing to adequately investigate and to consult an expert in preparation for the dangerous-offender hearing. We also conclude that defense counsel's deficiency had "a tendency to affect the result of the prosecution"—the possibility that it affected the result is more than merely theoretical. Accordingly, petitioner established prejudice and is entitled to post-conviction relief. We therefore affirm the judgment of the trial court and the decision of the Court of Appeals.

## I.   FACTS

For background, we begin by briefly describing the facts adduced during the guilt phase of petitioner's criminal prosecution. As the Court of Appeals described the incident that led to the convictions, in 2006, petitioner and his wife quarreled in a tavern, and then "petitioner walked out the back door to work on his truck. Petitioner later returned, exchanged words with his wife, and then left, slamming the door on his way out. This drew the attention of the victim, an elderly man, who followed petitioner out the door." 277 Or App at 618. Petitioner then "punched him, causing him to fall." *Id*. Thereafter, petitioner went back into the bar, told his wife to leave with him, and they walked out "the same door, walking by the victim as they departed. The victim suffered a massive head injury and died the next day." *Id*.

Petitioner was charged with first-degree manslaughter, a Class A felony, and second-degree assault. The state's theory of the case was that the attack was unprovoked. The defense theory was that petitioner had not acted knowingly (the assault charge) or recklessly (the manslaughter charge) and, instead, had hit the victim in self-defense.

The defense relied on evidence that petitioner had witnessed numerous acts of domestic violence by his parents when he was a child, and later by other inmates while in prison, to argue that, when petitioner hit the victim, he reasonably feared that the victim intended to use a weapon against him. More particularly, petitioner testified that he

was quite close with his mother, had witnessed his father hit his mother on nearly a daily basis, and that one time he had hit his father when his father was hitting his mother. He also testified that he had had to fight in self-defense while in prison. In addition, petitioner's sisters provided testimony indicating that petitioner's early home life had been chaotic. One sister testified that there was considerable abuse between their parents, primarily instigated by their mother, and that she left home as a teenager due to verbal abuse by their mother. Another sister testified that their parents were constantly physically fighting, and described their mother as "the violent one." She also testified that petitioner had been confined in the Skipworth juvenile facility multiple times because he "wouldn't go to school." She also indicated that he had been in juvenile facilities at St. Mary's Home for Boys and at MacLaren School for Boys.[2]

A.   *The Dangerous-Offender Sentence*

A jury found petitioner guilty of both charges. The state then sought to have petitioner sentenced as a "dangerous offender" on the manslaughter charge under ORS 161.725 to 161.737.[3] The presentence hearing at which the jury would determine whether petitioner was a dangerous offender was critically important to petitioner.

In part, ORS 161.725(1)(a) provides that a sentencing court may impose an enhanced dangerous-offender sentence if a defendant is being sentenced for a Class A felony and suffers from "a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another." First-degree manslaughter generally requires imposition of a mandatory minimum prison sentence of 10 years and carries a maximum indeterminate prison sentence of 20 years. ORS 137.700(3)(a)(D); ORS 161.605(1); ORS 163.118(3). However, if the state proves that the defendant is a dangerous offender, upon proof of certain other facts, the determinate prison term for the

_____

[2] The MacLaren School for Boys is now known as the MacLaren Youth Correctional Facility.

[3] Our references throughout this opinion are to the versions of ORS 161.725 to 161.737 that were in effect in 2006 at the time of the crimes, although those statutes for the most part remain the same at present.

crime, a Class A felony, can be increased, and the associated maximum indeterminate prison term becomes 30 years.[4]

The state prevailed at the dangerous-offender hearing. The resulting dangerous-offender sentence that petitioner received was considerably longer than the sentence he otherwise would have received. The sentencing court set the determinate portion of petitioner's dangerous-offender sentence at 260 months in prison (four months short of 22 years) and imposed an indeterminate prison term of 30 years.

After he was sentenced, petitioner's direct appeal was unsuccessful. *State v. Richardson*, 226 Or App 85, 202 P3d 290, *rev den*, 346 Or 213 (2009).

B.   *Petitioner's Dangerous-Offender Hearing*

The issue under our consideration in petitioner's action for post-conviction relief relates to the dangerous-offender hearing and defense counsel's preparation for it. We therefore describe that hearing in detail.

By statute, a mental health professional will be appointed to evaluate a criminal defendant in a dangerous-offender case and will be involved in the process leading to the determination of dangerous-offender status. Under ORS 161.735(1), the trial court is required to order "an examination by a psychiatrist or psychologist." The psychiatrist or psychologist must submit to the court "a written report of findings and conclusions, including an evaluation of whether the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity." ORS

---

[4] Under ORS 161.737(2), when a court imposes a dangerous-offender sentence, "the sentencing judge shall indicate on the record the reasons for departure and shall impose, in addition to the indeterminate sentence imposed under ORS 161.725, a required incarceration term that the offender must serve before release to post-prison supervision." Under ORS 161.725(1), if a person is sentenced as a dangerous offender under ORS 161.725 to 161.737 for a Class A felony, "the maximum term of an indeterminate sentence of imprisonment for a dangerous offender is 30 years." In this case, the jury made findings in support of departure that petitioner had committed the offense while on felony probation, that he had engaged in persistent involvement in similar offenses, and that he was being sentenced for a felony that seriously endangered the life or safety of another, and the court based the determinate portion of the dangerous offender sentence on those findings.

161.735(3). A presentence dangerous-offender hearing is then held, and, unless the criminal defendant waives the right to a jury, a jury makes the determination whether the criminal defendant has a "severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another." ORS 161.725(1)(a); ORS 161.735(5), (6).

Accordingly, the trial court ordered a psychiatrist, George Suckow, M.D., to evaluate petitioner before the dangerous-offender hearing. After examining petitioner, Suckow submitted a written report to the court and counsel for the parties. His report was adverse to petitioner.

Suckow's report recounted that petitioner had a history of physical abuse by his mother, and that he had been placed in the St. Mary's Home for Boys at the age of 12 after running away from home. The report further indicated that petitioner had a history of getting into fights during grade school, as well as at St. Mary's. It indicated that petitioner had issues with truancy from school, and he subsequently was placed at MacLaren, an Oregon youth correctional facility, and then later in a federal youth correctional institution in California. Suckow's report also recounted that petitioner had an extensive criminal history, beginning when he was a juvenile and continuing into his adult life, and "a pervasive pattern of disregard for and violation of the rights of others" that was "present prior to and after the age of 15." Suckow diagnosed petitioner with amphetamine abuse as well as an antisocial personality disorder. Suckow ultimately opined that petitioner "does have a severe personality disorder indicating a propensity toward crimes that seriously endanger the life and safety of others."

Suckow testified at the dangerous-offender hearing, and its primary focus was on Suckow's evidence. Suckow testified that his examination of petitioner involved a forensic interview that lasted approximately an hour, a review of petitioner's history and background including investigation reports of the current crime and petitioner's criminal record, and an assessment of petitioner's present mental status. He explained how diagnoses were made under the American Psychiatric Association's *Diagnostic and Statistical Manual*

*of Mental Disorders* (4th ed text rev 2000), hereafter referred to as *DSM-IV-TR*, and the various categories of disorders in that manual. He explained, referring to the *DSM-IV-TR*, that "[a] personality disorder is a pervasive pattern of behavior that starts in childhood and lasts for life. And it's not a psychosis, it's not a major mental illness; it's a way of behaving that that person has." He indicated that people with antisocial personality disorders are "normal except they seem to do things that are wrong and they have little regard for the rights of others." He described them as being prone to getting into fights and getting into trouble in school, and often having substance abuse problems. He opined that they tend to be deceitful and lacking in long-range goals. He noted, however, that they often do well in confinement due to the structure provided.

Suckow explained that, in reaching a diagnosis of petitioner, he looked at petitioner's pattern of behavior over the years and compared that to what petitioner told him. He concluded that petitioner had been fairly open and honest with him and had acknowledged that he had had "a lot of trouble in school and with the law." Suckow further testified that petitioner had said that, when he had been sent to St. Mary's at the age of 12, he "didn't like the discipline there and got into fights just like he had in grade school." He described petitioner's later juvenile history as involving incarceration at MacLaren, followed by several years in a federal youth institution based on theft of a motorcycle. Petitioner also was incarcerated in an adult correctional facility in California, and he served time in a Washington state penitentiary for assault. In Oregon, petitioner pleaded guilty to numerous offenses over a number of years, and he had an attempted-murder charge reduced to second-degree assault. Suckow testified that petitioner acknowledged that he started to use amphetamines in the 1990s. Suckow opined that petitioner had had "a conduct disorder before the age of 15" and diagnosed petitioner with an antisocial personality disorder.

Through cross-examination of Suckow, defense counsel's main focus was on whether there was sufficient evidence that petitioner suffered from a "severe personality

disorder," as required for a dangerous-offender sentence. In his cross-examination, defense counsel highlighted the requirements under the *DSM-IV-TR* for a diagnosis of antisocial personality disorder and introduced, without objection, documents showing the criteria for diagnoses of antisocial personality disorder and conduct disorder found in the *DSM-IV-TR*. He noted that a criterion for diagnosis of an antisocial personality disorder was "evidence of a conduct disorder with onset before age 15 years."[5] Defense counsel then asked Suckow whether, if a person did not meet that criterion, the person could be diagnosed with an antisocial personality disorder. Suckow indicated general agreement with counsel's suggestion that that criterion must be met. Suckow then suggested that the age criterion was "not an absolute," because people do not simply change on the date they reach a specified age.

Defense counsel questioned Suckow about how much (or how little) Suckow knew concerning petitioner before petitioner was 15 years old. Counsel zeroed in on the criteria for a "conduct disorder" as specified in the DMS IV-TR, which required that three criteria be satisfied in order to make a

---

[5] For ease of reference, we include a list of the pertinent criteria for diagnosis of an antisocial personality disorder under the *DSM-IV-TR*:

"A. There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following:

"(1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest

"(2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure

"(3) impulsivity or failure to plan ahead

"(4) irritability and aggressiveness, as indicated by repeated physical fights or assaults

"(5) reckless disregard for safety of self or others

"(6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations

"(7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

"B. The individual is at least age 18 years.

"C. There is evidence of conduct disorder with onset before age 15 years.

"D. The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or a manic episode."

*DSM-IV-TR* at 706.

diagnosis of the disorder.[6] One of the criteria for a conduct disorder is the initiation of physical fights. Counsel asked Suckow how that criterion could be satisfied, given that Suckow's report did not specify who had initiated the fights Suckow had mentioned in the report. Suckow responded: "Well, he told me he got into fights. Now, to me, that doesn't mean he was picked on; means he started them." Suckow acknowledged that his report included that petitioner had reported being bullied by other children later at MacLaren,

---

[6] For ease of reference, we include a list of the pertinent criteria for diagnosis of a conduct disorder under the *DSM-IV-TR*:

"A. A repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated, as manifested by the presence of three (or more) of the following criteria in the past 12 months, with at least one criterion present in the past 6 months:

"**Aggression to people and animals**

"(1) often bullies, threatens, or intimidates others

"(2) often initiates physical fights

"(3) has used a weapon that can cause serious physical harm to others (e.g., a bat, brick, broken bottle, knife, gun)

"(4) has been physically cruel to people

"(5) has been physically cruel to animals

"(6) has stolen while confronting a victim (e.g., mugging, purse snatching, extortion, armed robbery)

"(7) has forced someone into sexual activity

"**Destruction of property**

"(8) has deliberately engaged in fire setting with the intention of causing serious damage

"(9) has deliberately destroyed others' property (other than by fire setting)

"**Deceitfulness or theft**

"(10) has broken into someone else's house, building, or car

"(11) often lies to obtain goods or favors or to avoid obligations (i.e., 'cons' others)

"(12) has stolen items of nontrivial value without confronting a victim (e.g., shoplifting, but without breaking and entering; forgery)

"**Serious violations of rules**

"(13) often stays out at night despite parental prohibitions, beginning before age 13 years

"(14) has run away from home overnight at least twice while living in parental or parental surrogate home (or once without returning for a lengthy period)

"(15) is often truant from school, beginning before age 13 years."

*DSM-IV-TR* at 98-99 (boldface in original).

and also that the report did not specify that petitioner had initiated any of the fights in which he had been involved before that time. Counsel then pressed the point, asking if Suckow was merely "guessing," but Suckow responded: "No. I'm drawing a conclusion based upon his lifestyle and what he told me." Counsel then ran through a number of other criteria for a conduct disorder, which Suckow acknowledged had not been satisfied.

Counsel then asked about the criterion, "run away from home overnight at least twice while living in parental or parental-surrogate home" or "once without returning for a lengthy period." Counsel noted that Suckow's report mentioned only one incident of petitioner running away from home before age 12, but Suckow responded that "it sounded to me like he'd done it more than once." Counsel then noted that Suckow's report suggested that petitioner had skipped school after leaving St. Mary's at the age of 13 or 14, and he asked how that could satisfy the conduct disorder criterion of "often truant from school, beginning *before* age 13." (Emphasis added.) Suckow's response was that he believed the age cut-off to be an arbitrary figure and that he considered that criterion satisfied.

On redirect examination, the prosecutor shored up Suckow's testimony. The prosecutor referred back to the diagnosis of antisocial personality disorder and asked, "is it correct that it does not require a diagnosis of conduct disorder; it just requires some evidence thereof?" Suckow replied: "Yes."

In addition to Suckow's testimony, the jury received information on petitioner's criminal history, which included numerous property crimes and assaults dating back to the 1970s. (Much of petitioner's criminal history had already been revealed during the guilt phase of the trial, when petitioner testified in his own defense.) The prosecutor also presented evidence about a physical altercation between petitioner and several uniformed deputies that occurred during a recess at trial. Evidence was also presented from victims of some of petitioner's prior crimes, including evidence of knife attacks on multiple members of a family after petitioner was caught stealing tires, an incident in which

petitioner rammed his vehicle into two police cars while trying to elude their pursuit, and an occasion when petitioner attacked a deputy sheriff in a county jail.

Although defense counsel cross-examined Suckow, he did not offer expert psychological testimony to rebut Suckow's testimony and diagnosis of petitioner. The only witness whom defense counsel called was petitioner's wife.

In closing argument, the prosecutor emphasized that the determination of whether petitioner suffered from a personality disorder as described in the dangerous offender statute was a matter for the jury, not the expert, to decide. He noted petitioner's lengthy criminal history, and he pointed out that the gaps in that history were during periods of time when petitioner was imprisoned.

Defense counsel's closing argument focused on Suckow's testimony and the prosecution's burden of proof. Defense counsel pointed out that Suckow had acknowledged that he accepted the *DSM-IV-TR* criteria for conduct disorder, but that (1) Suckow lacked any basis for concluding that petitioner had initiated the fights he had been in, (2) Suckow had not documented more than one instance of petitioner running away from home, and (3) Suckow's report revealed instances of truancy only after petitioner had left St. Mary's at the age of 13 or 14. Defense counsel argued that on matters when Suckow "had to draw certain conclusions, he was saying he did not have the facts to support him. But he then kind of said he was assuming, as an adult, it's probable, maybe, it was there as a child—recall that? 'Probable' is not beyond a reasonable doubt." Defense counsel also noted that the jury was not bound by Suckow's opinion, and he urged the jury to use the criteria from the *DSM-IV-TR* to conclude that the criteria for a conduct disorder had not been met and that, therefore, "[t]he antisocial behavior, then is not there either."

After closing arguments, the trial court instructed the jury to make findings as to whether petitioner was "suffering from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another and that, because of the dangerousness

of [petitioner], an extended period of confined correctional treatment or custody is required for the protection of the public." ORS 161.725(1). The court also included an instruction that the jury was not required to accept the opinions of experts. The jury unanimously found that petitioner suffered from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another.

C.   *The Post-Conviction Proceeding*

        Petitioner initiated the present proceeding, alleging that his defense counsel in the underlying criminal proceeding had provided inadequate assistance of counsel, in violation of Article I, section 11, of the Oregon Constitution. As pertinent here, petitioner alleged:

> "Defense counsel failed to conduct an investigation to support his decision not to obtain a defense psychological evaluation of petitioner to rebut testimony by prosecution expert, Dr. George Suckow, that petitioner suffered from an antisocial personality disorder. A defense psychologist would have provided testimony that petitioner does not meet the diagnostic criteria for an antisocial personality disorder and that petitioner did not suffer from a severe personality disorder. As a result of counsel's failure to retain a defense psychologist the jury relied exclusively upon the testimony of Dr. Suckow to determine that petitioner did suffer from a severe personality disorder. Petitioner was thereafter sentenced as a dangerous offender under ORS 161.725. An attorney exercising reasonable professional skill and judgment would have retained a psychologist for the reasons outlined above."

        In support of that claim, petitioner introduced a written report from a clinical psychologist, Dr. Norvin Cooley. In his written report, Cooley indicated that he had been hired to evaluate petitioner and examine records to determine if "there were factors that should have been considered by the [jury] which were not provided in [petitioner's] defense that could have influenced the [jury's] opinion as to whether or not [petitioner] was a dangerous offender." His record review covered (1) the presentencing investigation that had been done before petitioner's dangerous offender hearing; (2) petitioner's records at St. Mary's Home for Boys; (3) Suckow's

report and testimony; and (4) the prosecutor's and defense counsel's opening and closing arguments at the dangerous offender hearing. Cooley further noted that he and other psychologists in Oregon would have been available as defense experts at the time of petitioner's dangerous-offender hearing and would have obtained and reviewed critical historical background records concerning petitioner.

With respect to the presentencing investigation report, Cooley observed that it included 14 felony convictions, 21 misdemeanors, and a juvenile adjudication "for interstate transportation of a stolen vehicle [when petitioner] was 15 years old." Cooley further noted that the report indicated that petitioner had been in the Skipworth juvenile facility for hitting his father during a domestic violence incident involving both of his parents.[7]

Cooley's report also recounted numerous facts from his review of the St. Mary's records.[8] He indicated that the records showed that petitioner, after being confined in the Skipworth juvenile facility, had been moved to St. Mary's in 1965, at the age of 12. At St. Mary's, petitioner had trouble getting along with other children and was easily provoked to anger. A caseworker note indicated that petitioner had been suspended from two different schools, once for "fighting, swearing, and truancy." A referral letter sent to St. Mary's indicated that petitioner had "run away from home on several occasions in May 1965" and, on one of those occasions, he had stolen two bicycles. But Cooley also noted that the St. Mary's records revealed numerous instances of domestic violence, in particular by petitioner's mother, leading to police contacts. He recounted that petitioner's caseworkers at St. Mary's had found petitioner's mother to be "virtually impossible to work with" and had concluded that petitioner's problems as a youth stemmed from his home life. The records also described numerous instances of her abusive behavior toward petitioner, both in public and at home. One of petitioner's confinements to Skipworth was "for his own

---

[7] Some evidence of that incident had been adduced during the guilt phase of petitioner's trial. *See* 362 Or at 239.

[8] The St. Mary's records themselves did not come into evidence in this case.

protection because mother threatened to pull him from any foster home."

Cooley indicated that the St. Mary's file included a number of evaluations of petitioner. As part of St. Mary's screening, a psychiatrist, Robert Johnson, M.D., had seen petitioner. Johnson described petitioner as a "seriously disturbed youngster" who had a very difficult relationship with his mother. Johnson had "diagnosed [petitioner] as demonstrating an adjustment reaction of early adolescence with behavior disturbance, severe." Johnson had thought that petitioner had a "poor prognosis" and likely "would be in conflict with authority indefinitely" but that a modification of his living situation "may attenuate this problem." Cooley also noted that the file contained information from a psychologist, Dr. Fischer. Fischer had found petitioner to be "very resistant to authority" and "unstable" but thought that, if petitioner developed a close relationship with a counselor, his prognosis would be "good." Fischer also had noted that petitioner's mother contributed significantly to petitioner's resistance to authority.

As for his review of Suckow's testimony, Cooley characterized the testimony as "conclud[ing] by inference that [petitioner] must have displayed a conduct disorder." Cooley, however, disagreed with Suckow on that point. Cooley acknowledged that the St. Mary's records showed that petitioner's "adjustment while there was not particularly positive." But highlighting the indications in the record that petitioner's mother was highly abusive, Cooley opined that petitioner's behavioral problems were a result of his home life. Cooley observed that "[t]here are other psychological, social, and familial issues which can create behaviors that, on the surface, appear antisocial when in fact they are due to impinging issues." Cooley emphasized that Johnson's psychiatric evaluation of petitioner in the St. Mary's records—which Suckow had not reviewed—diagnosed petitioner "with an adjustment disorder, not a conduct disorder."

Cooley noted that his review of the case indicated that Suckow's opinion had been important to the state's contention that petitioner suffered from a severe personality disorder. Cooley directly rebutted Suckow's diagnosis

of petitioner. Cooley concluded that, if a defense expert had been obtained, the expert could have testified that, had Suckow reviewed the St. Mary's records, Suckow would not have been able to accurately diagnose an antisocial personality disorder. And, Cooley opined, it would not have been possible, based on all of the available data, "to conclude that [petitioner] demonstrates the symptoms and behaviors consistent with the diagnosis of an antisocial personality disorder."

In response, the state offered into evidence the deposition of petitioner's defense counsel, Jagger. Jagger had reviewed petitioner's background and family information, as well as his criminal history. After reviewing Suckow's report, he considered whether or not to hire an expert to present evidence on petitioner's behalf at the dangerous-offender hearing. He could not recall whether he had talked to an expert about the case, but he remembered that he did not call an expert. He explained that he had tried approximately 20 cases involving dangerous-offender hearings in the past and that he sometimes used an expert but sometimes did not. He stated that sometimes, in the minority of cases, "I think I can make better hay with what they had and they presented than confusing things by having my own expert." He stated that he "did not think that there was any benefit to actually hir[ing] someone to do an evaluation" in petitioner's case. Jagger had not obtained petitioner's juvenile records from St. Mary's.

In light of Jagger's deposition testimony, the state argued at the post-conviction hearing that defense counsel had made a strategic decision not to rely on defense expert testimony and that his decision to rely instead on cross-examination of Suckow was reasonable. The state argued that "trial counsel did an extraordinary job in establishing that Dr. Suckow, by his own criteria, had not met the criteria for the diagnosis that he testified to." The state argued that, had defense counsel called an expert such as Cooley to testify at the dangerous-offender hearing, such testimony "would have filled in the elements and the blanks in the state's case," such as establishing that petitioner had, in fact, run away from home more than once and been truant from

school. The state pointed out that the psychological and psychiatric evidence from the St. Mary's records confirmed that petitioner had numerous behavioral problems and was very resistant to authority. Thus, the state asserted, bringing that information before the jury would, in fact, have been ineffective—providing the jury with additional evidence of a conduct disorder that existed before petitioner reached the age of 15.

At the post-conviction hearing, counsel for petitioner argued that, in light of the diagnosis by the psychiatrist that Cooley had found in the St. Mary's records, "the jury would not have been able to legally make a determination that [petitioner] had a severe personality disorder, an antisocial personality disorder, and could not therefore have legally, under the statutory requirements, have made the requisite findings for imposition of a dangerous offender sentence upon him." Further, petitioner argued, an opinion of a defense psychologist that petitioner did not have a conduct disorder would have established that there was no antisocial personality disorder and, "[w]ithout an antisocial personality disorder, the jurors could not have made their finding."

The post-conviction court orally ruled in favor of petitioner and rejected the crux of the state's argument:

"I think defense counsel did an excellent job with Dr. Suckow on cross and got as much as he could get, and it was really quite a bit, showing that Suckow's diagnosis had some gaps in it, although the doctor still held with the same diagnosis even after he was impeached.

"But what he couldn't get on cross is that bottom line that says this behavior is explained through a totally different diagnosis that would throw out the possibility of dangerous offender. So if all of that behavior could be explained with an adjustment reactive disorder, we're not in dangerous offender territory anymore.

"I agree that Dr. Cooley had a number of facts that were not flattering to petitioner. *** But all of those facts could then have been explained by an alternative diagnosis. And you can't get there on cross.

"So despite the very good job I think the attorney did on cross, it still left a hole that he could have filled by having

his own expert. I think that was an inadequacy and I think this case needs to be resentenced."

Similarly, the post-conviction court's written findings explain the import of petitioner's prior adjustment reactive disorder diagnosis and refer to other circumstances of petitioner's background that were unknown to defense counsel, both of which undercut Suckow's diagnosis of petitioner:

> "Pet. found to be dangerous offender + c[ourt] sentenced as d[angerous] o[ffender] largely based on D.A.'s expert, Dr. Suckow. Trial att[orney] did not consult or call an expert. Suckow found that pet[itioner] had a personality disorder (written report says severe) which requires an underlying diagnosis of conduct disorder which in turn requires onset before age 15. He did not have pet[itioner's] juvenile records from St. Mary's that contain a diagnosis of adjustment reactive disorder not conduct disorder. This court agrees with att[orney] that an expert witness is not always required. Att[orney] did an excellent job impeaching Suckow based on whether or not there was a valid diagnosis of conduct disorder, but was unable by using cross, to bring in the key issue of the prior diagnosis of adjustment disorder—a diagnosis that would disqualify for dang[erous] off[ender]. Dr. Cooley would have added facts that were not flattering to pet[itioner] but that could have been explained by the adj[ustment] disorder diagnosis. That diagnosis would also allow att[orney] to bring in details of pet[itioner's] upbringing that were relevant and unknown to Suckow. That diagnosis might well lead a court to impose a maximum guideline sentence but would not have, if believed by the jury, have allowed a d[angerous] o[ffender] sentence."

## D.   *The Court of Appeals Opinion*

The state appealed the judgment of the post-conviction court. In affirming, the Court of Appeals agreed with the post-conviction court that "counsel made his decision to challenge Suckow's testimony solely through cross-examination without properly investigating alternative defense strategies." *Richardson,* 277 Or App at 626.

The Court of Appeals also concluded that petitioner had been prejudiced by his counsel's failure to properly investigate, including consulting an expert in psychology. Significantly, the court explained, that failure led to defense

counsel's ignorance concerning petitioner's psychological diagnosis when he was a boy:

> "The post-conviction court expressly found that, although counsel 'did an excellent job impeaching Suckow,' he was 'unable by using cross, to bring in the key issue of the prior diagnosis of adjustment disorder[.]' That finding is supported by the evidence, and thus we are bound by it. *Montez [v. Czerniak*, 355 Or 1, 8, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014)]. Like Suckow, counsel did not possess petitioner's juvenile mental health records from St. Mary's, which revealed that petitioner had been diagnosed with an adjustment disorder prior to age 15. During cross-examination, counsel did not question Suckow about adjustment disorders or ask Suckow whether the evidence suggested that petitioner suffered from an adjustment disorder rather than a conduct disorder. Thus, although counsel was able to challenge Suckow's diagnosis by highlighting a lack of evidence of a conduct disorder prior to age 15, he was unable during cross-examination to elicit testimony that petitioner might actually have suffered from an adjustment disorder."

*Id.* at 627-28.

The Court of Appeals concluded that it was likely that the jury had relied on Suckow's diagnosis of petitioner as having a conduct disorder instead of an "adjustment disorder" before the age of 15, and then it turned to the DSM-IV-TR's definition of "Adjustment Disorder."[9] As part of its analysis of prejudice, the Court of Appeals implicitly concluded that defense counsel might have called a psychologist like Cooley to testify and then reasoned that a jury hearing the testimony could have found in petitioner's favor:

> "Had the jury accepted Cooley's testimony over Suckow's, it could have found that a diagnosis of an antisocial personality disorder was unavailable. In that case, the jury might not have found that petitioner had a 'severe personality disorder indicating a propensity toward crimes that seriously

---

[9] The Court of Appeals did not explain why it considered petitioner's diagnosis from 1965, an "adjustment reaction of early adolescence with behavior disturbance, severe," to be identical to an "adjustment disorder" as defined in the *DSM-IV-TR*, which was published many decades later. However, Cooley had referred to the 1965 diagnosis as an "adjustment disorder" in his report.

endanger the life or safety of another' or that petitioner's mental health rendered him a dangerous offender."

*Id.* at 629.

## II.   ANALYSIS

A petitioner seeking post-conviction relief based on inadequate assistance of counsel in violation of the right to adequate counsel derived from Article I, section 11, of the Oregon Constitution, "must prove that his or her trial counsel failed to exercise reasonable professional skill and judgment and that, because of that failure, the petitioner suffered prejudice." *Pereida-Alba v. Coursey*, 356 Or 654, 661, 342 P3d 70 (2015). We conclude that petitioner proved both deficient performance by defense counsel and prejudice as a result.

### A.   *Defense Counsel's Failure to Investigate*

This court has recently had the opportunity to explore the issue of inadequate assistance of counsel with respect to a failure to investigate expert testimony in *Johnson v. Premo*, 361 Or 688, 399 P3d 431 (2017). In that case, we concluded that a defense team's failure to adequately investigate the client's version of the facts and to seek additional forensic data about the cause of the victim's death constituted ineffective assistance of counsel. As explained below, the post-conviction court's and the Court of Appeals' conclusions that counsel in this case failed to conduct an adequate investigation comports with our conclusion in *Johnson*.

As we explained in *Johnson*, when a petitioner seeks to establish that counsel failed to exercise reasonable skill and judgment, what constitutes adequate performance is fact-specific and dependent on the "nature and complexity of the case." 361 Or at 701; *Krummacher v. Gierloff*, 290 Or 867, 873, 627 P2d 458 (1981). We further stated in *Johnson* that

"the test for adequacy of assistance of counsel 'allows for tactical choices that backfire, because, by their nature, trials often involve risk.' *Krummacher*, 290 Or at 876. '[I]f counsel exercises reasonable professional skill and judgment, a reviewing court will not second-guess the lawyer in the name of the constitution, but neither will the court

ignore decisions made in the conduct of the defense which reflect an absence or suspension of professional skill and judgment.' *Id.* at 875-76."

*Johnson*, 361 Or at 702 (brackets in original). Tactical decisions, we explained, must be based on "a reasonable investigation." *Id.* at 703. At the same time, we recognized an exception to that rule: "when counsel has 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'" *Id.* at 709 (quoting *Strickland v. Washington*, 466 US 668, 691, 104 S Ct 2052, 80 L Ed 2d 674 (1984)). Ultimately, we held that the petitioner's defense counsel in *Johnson* rendered inadequate assistance when they failed to investigate a defense theory suggested by their client's account of events before they adopted a "wrong venue" defense that was "at best marginally viable in the guilt phase" and that "lacked any tactical value in the penalty phase." 361 Or at 710.

Our holding in *Johnson* is consistent with other "failure to investigate" cases decided by both this court and the United States Supreme Court. In [*Lichau v. Baldwin*](), 333 Or 350, 360, 39 P3d 851 (2002), for example, the petitioner contended that his lawyer's decision to withdraw an alibi defense was "not supported by an investigation of potential alibi witnesses and military records that was reasonable under the circumstances." After reviewing the limited investigation the lawyer undertook despite knowledge that should have prompted further investigation, this court concluded that the lawyer had rendered inadequate assistance. *Id.* at 361. As the court explained, "each decision to limit investigation of a particular defense itself must be a reasonable exercise of professional skill and judgment under the circumstances." *Id.* at 360.

Similarly, in *Wiggins v. Smith*, 539 US 510, 523, 123 S Ct 2527, 156 L Ed 2d 471 (2003), a case in which the petitioner had been denied post-conviction relief on the ground that his lawyers had made a tactical decision not to investigate his life history beyond reviewing two sets of records, the Supreme Court described the issue as "whether the investigation supporting counsel's decision not to introduce

mitigating evidence of Wiggins' background *was itself reasonable*." (Emphasis in original.) The Court concluded that the lawyers had "abandoned their investigation of petitioner's background after having acquired only a rudimentary knowledge of his history from a narrow set of sources" and that, after review, reasonably competent counsel would have pursued leads suggested by those records as a necessary predicate "to making an informed choice among possible defenses." *Id.* at 525-26; *accord Williams v. Taylor*, 529 US 362, 396-97, 120 S Ct 1495, 146 L Ed 2d 389 (2000) (in a capital-sentence case dependent on a finding of future dangerousness, holding that, in failing to investigate and discover juvenile, social services, and prison records showing that the defendant was abused as a child, his limited intellectual ability, and his cooperative, nonviolent behavior in prison, trial counsel did not make a justifiable tactical decision to focus on the defendant's voluntary confession and did not fulfill their obligation to conduct a thorough background investigation).

To address the adequacy of defense counsel's investigation in this case, we must understand the nature and complexity of the issues presented by the dangerous-offender hearing. *Johnson*, 361 Or at 701; *Krummacher,* 290 Or at 873. First, the stakes for petitioner were high because of the possibility of a greatly enhanced sentence if he were found to be a dangerous offender who suffers from a severe personality disorder with a propensity toward criminal activity. Second, defense counsel knew that the jury had already heard evidence during the guilt phase of the trial concerning petitioner's extensive criminal history, his troubled early home life, and his confinement in numerous correctional institutions both as a child and as an adult. Third, defense counsel knew that a jury would decide the matter after hearing from a court-appointed psychiatrist who would testify adversely to petitioner, having diagnosed petitioner with an antisocial personality disorder. Fourth, defense counsel knew that the expert's diagnosis was based in significant part on interpretation of petitioner's juvenile history but that the expert's diagnosis was insufficiently supported by the historical information contained in the expert's report.

Petitioner alleged that defense counsel had "failed to conduct an investigation to support his decision not to obtain a defense psychological evaluation of petitioner to rebut testimony by prosecution expert, Dr. George Suckow, that petitioner suffered from an antisocial personality disorder." In light of the nature and complexity of the dangerous-offender sentencing proceeding and the information that defense counsel knew, we agree that defense counsel's decision not to investigate petitioner's background as a juvenile was not a reasonable exercise of professional skill and judgment. Defense counsel realized that Suckow would rely on petitioner's background as a juvenile to conclude that petitioner had a conduct disorder before age 15 as part of his diagnosis that petitioner had an antisocial personality disorder. Yet defense counsel decided not to further investigate petitioner's juvenile background—such as securing a copy of petitioner's records at St. Mary's School for Boys—even though defense counsel was aware that petitioner had had a rough childhood and had been repeatedly exposed to domestic violence at home. To state it another way, defense counsel knew that the state would call Suckow to testify that petitioner suffers from an antisocial personality disorder, indicating a propensity toward criminal activity, when neither defense counsel nor Suckow had obtained sufficient information about petitioner's history pertinent to that diagnosis. The record does not reflect that defense counsel even attempted to obtain additional data about petitioner's juvenile history to determine the accuracy or inaccuracy of the historical information provided by Suckow. We conclude that defense counsel's knowledge would lead a reasonable attorney to investigate the client's juvenile history further to prepare for a hearing at which the client was exposed to a markedly enhanced sentence as a dangerous offender.

We also conclude, in light of the nature and complexity of the dangerous-offender sentencing proceeding and the information that defense counsel knew, that defense counsel's decision not to consult an expert concerning Suckow's diagnosis of petitioner was not a reasonable exercise of professional skill and judgment. Although the state urges that defense counsel reasonably pursued a strategy of cross-examining Suckow to poke holes in Suckow's diagnosis,

defense counsel's choice not to obtain the assistance of a defense psychologist to address Suckow's evaluation was not an informed one. As the Supreme Court observed in *Wiggins*, when assessing the reasonableness of counsel's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." 539 US at 527.

In *State v. Huntley*, 302 Or 418, 730 P2d 1234 (1986), this court considered the relationship between expert testimony at a dangerous-offender proceeding and the requisite finding of fact that an offender suffered from a "severe personality disorder," as that term is used in ORS 161.725 (1987). Although the court concluded that the expert's role is not to make the ultimate legal determination concerning the appropriate sentence for a defendant, *Huntley*, 302 Or at 426, and both the instructions and arguments to the jury in this case tracked the rule of law announced in *Huntley*, the jury nevertheless heard Suckow's testimony that he had diagnosed petitioner with an antisocial personality disorder and his opinion that petitioner suffered from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of others. Under *Huntley*, the jury was expected to "make[] a common-sense decision based on as much relevant information as possible," 302 Or at 426, but that is far from a simple task when it involves evaluation of essentially the entire life of an offender, in addition to data provided by an expert psychologist or psychiatrist pursuant to ORS 161.735(3). Moreover, as we have explained in the past, when expert testimony is introduced on a subject, there can be a danger that the jury "may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence," thereby leading the jury "to abdicate its role of critical assessment." *State v. Brown*, 297 Or 404, 439, 687 P2d 751 (1984).

That is particularly true in this case, when defense counsel had identified a significant flaw in Suckow's written evaluation of petitioner. As counsel's cross-examination of Suckow made abundantly clear, Suckow's report, which had been prepared after only a single meeting with petitioner and without the benefit of any psychological testing, did not

contain enough data about petitioner's early life to definitively establish that there was "evidence of conduct disorder with onset before age 15 years," as required for a diagnosis of antisocial personality disorder. *See* 362 Or at 244 n 5. But this record contains no adequate explanation as to why defense counsel did not undertake further investigation to develop the theory that Suckow's diagnosis was incorrect and based on insufficient evidence. As noted above, counsel merely said that he believed that sometimes, in the minority of his cases, he found that it was preferable not to introduce expert testimony, because he could "make better hay" with what the state presented rather than "confusing things by having my own expert." That, however, does not explain why defense counsel did not at least consult with an expert about the apparent weakness in Suckow's diagnosis and its unreliability. As the post-conviction court found, defense counsel was unaware that petitioner had been diagnosed as a youth with an adjustment reactive disorder and counsel was unable to establish on cross-examination that, in light of that information, (1) petitioner's behavior as a juvenile should be viewed "through a totally different diagnosis" and could be explained by adjustment reactive disorder after abuse and other conditions petitioner had suffered at home and (2) Suckow's diagnosis of antisocial personality disorder was wrong.

Of course, not every failure to investigate information that could support a viable defense strategy will ultimately be deemed inadequate assistance of counsel. In *Strickland*, the Court addressed the question of when it was permissible for counsel to curtail an investigation into a client's mental health. The Court observed that strategic choices made after "thorough investigation of law and facts relevant to plausible options" do not constitute ineffective assistance of counsel, but strategic choices "made after less than complete investigation" may be reasonable only "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 US at 690-91. Although *Strickland* concerned a death penalty trial and penalty-phase mitigation evidence, the context is similar enough to dangerous-offender sentencing that the case provides some guidance here.

In *Strickland*, the trial attorney represented a client (the respondent) who confessed to multiple murders and other offenses and who pleaded guilty. During the plea colloquy, the respondent told the judge that he had no significant criminal record and that he had committed the crimes due to the stress caused by his inability to support his family. The judge indicated that he respected people who took responsibility for their crimes. *Id.* at 672. The respondent waived his right to a sentencing jury, and, in preparing for the sentencing hearing before the judge, the trial attorney did not seek out character witnesses or obtain a psychological evaluation and instead concluded that "it was advisable to rely on the plea colloquy for evidence about respondent's background and about his claim of emotional stress." *Id.* at 673. The trial attorney knew that the respondent, despite his claim otherwise at the plea hearing, had an extensive criminal record. The trial attorney also had not observed the respondent to have any psychological problems, and a pre-plea psychological report indicated that the client had no major mental illness or extreme emotional disturbance. *Id.* at 673, 676. By limiting the evidence on which he relied at sentencing, the trial attorney successfully kept out evidence of his client's criminal record as well as the psychological report. *Id.* at 673-74. The court nonetheless sentenced the respondent to death, and the respondent subsequently asserted that he had received inadequate assistance of counsel based on a failure to adequately investigate mitigating evidence and to obtain additional psychological evidence. *Id.* at 675.

The Court rejected the respondent's arguments. The Court indicated that, when facts supporting a potential line of defense are known to defense counsel, "the need for further investigation may be considerably diminished or eliminated altogether." 466 US at 691. Ultimately, the Court concluded that counsel had made a reasonable strategic choice "to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes." *Id.* at 699. The Court observed that restricting character testimony to what came in at the plea hearing "ensured that contrary character and psychological evidence and respondent's

criminal history, which counsel had successfully moved to exclude, would not come in." *Id*. Thus, the Court concluded, counsel had exercised reasonable professional judgment in preparing for the sentencing hearing.

The present case bears some similarity to *Strickland*, but in a critical respect is different from that case. A bit like the trial attorney in *Strickland* who relied on gaps in the facts of record, counsel in this case had a sentencing strategy that depended, in part, on pointing out gaps in the information about his client's history that Suckow used to arrive at a diagnosis. There is, however, a significant difference between this case and *Strickland*.

In *Strickland*, the trial attorney made his decision to forego presenting the psychological evidence because he had determined—based on facts known to him from his client and from a prior psychological report—what the drawbacks would be to presenting such evidence. Here, by contrast, no evidence was presented that indicated that counsel knew whether pursuit of additional information about petitioner's juvenile history would undermine or assist his defense strategy. There is no indication that the additional information from petitioner's St. Mary's records was already known to defense counsel when he decided to only cross-examine Suckow.

Thus, although defense counsel asserted that he had made a calculated strategic decision that this was one of the minority of cases in which it was preferable not to rely on a defense expert, he did so without adequate knowledge of the underlying facts. To be a reasonable exercise of professional skill and judgment, a lawyer's strategic decisions "must be grounded on a reasonable investigation." *Gorham v. Thompson*, 322 Or 560, 567, 34 P3d 161 (2001). In sum, adequate counsel in this situation would have gained further information about petitioner's psychological conditions and juvenile history and consulted with a defense expert in the field of psychology to determine how best to counter Suckow's evidence that petitioner suffered from an anti-social personality disorder.

B.   *Prejudice to Petitioner*

That conclusion, however, does not end our inquiry. The remaining question is whether petitioner has established

that defense counsel's deficient performance prejudiced him. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991).

This case presents an opportunity to examine an issue that we had little occasion to address in *Johnson*: the nature of the test to be applied to establish prejudice in a "failure to investigate" case under Oregon law. Petitioner contends that Oregon law does not require proof of probable, more-likely-than-not, prejudice and that he has met the Oregon standard of prejudice articulated in cases such as *Krummacher*, 290 Or at 883, and *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995): proof that the deficient performance had "a tendency to affect the result of the prosecution." Using the federal formulation of prejudice, the state argues that petitioner was required to prove that (1) it was "reasonably probable" that competent defense counsel, after conducting an adequate investigation and consulting an expert, would have presented the testimony of that expert at trial and (2) it was also "reasonably probable" that, with that testimony, the outcome of the hearing would have been different. The state argues that petitioner failed to meet that test.

We begin with the proper formulation of prejudice under Oregon law. The state is correct that the federal formulation of prejudice in a case like this one requires the petitioner to prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," that is, a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. But to the extent the state suggests that petitioner was required to establish prejudice by a probability, or on a more-likely-than-not basis, we have rejected that standard. As this court explained several years ago in *Green v. Franke*, 357 Or 301, 322, 350 P3d 188 (2015), "where the effect of inadequate assistance of counsel on the outcome of a jury trial is at issue, it is inappropriate to use a 'probability' standard for assessing prejudice." This court indicated that, "because many different factors can affect the outcome of a jury trial, in that setting, the tendency to affect the outcome standard *demands more than mere possibility, but less than probability.*" *Id*. (emphasis added). Although *Green*

concerned a jury's guilt-phase determination, the same is true when we are assessing prejudice in a case involving a jury deciding a *sentencing* issue.

The more difficult aspect of the prejudice prong is how to apply the "tendency to affect the outcome" test when criminal defense counsel has failed to adequately investigate before proceeding with a course of action at a hearing. The parties and *amicus curiae* Oregon Criminal Defense Lawyers Association differ on their approach to application of the test.

The state argues that the analysis of prejudice focuses on the ultimate effect on the jury's determination and, therefore, ought to include a "preliminary step" for a petitioner's proof involving an objective test: proof that "it is reasonably probable that a competent attorney would have presented the evidence" that would have been uncovered through an adequate investigation. In this case, the state contends, competent defense counsel would not have chosen to use the information from Cooley's report because it would have undercut the cross-examination strategy and added factual information that would have supported Suckow's testimony that petitioner suffered from a conduct disorder before age 15.

In contrast, petitioner and *amicus* argue that adopting the state's "preliminary step" would change the prejudice analysis in post-conviction relief cases. Petitioner argues that the Oregon test is "intentionally general" so as to cover the myriad ways that an inadequate investigation can have an impact on the outcome, and he assumes that defense counsel may well have used the information from Cooley's report in arguing that it would have had a tendency to affect the outcome of the proceeding. *Amicus* argues that the force of this court's decision in *Green* requires us to reject the "preliminary step" argument and proposed test.[10]

---

[10] Petitioner also contends that the state raises its "preliminary step" argument for the first time on appeal, to his detriment. He argues that, had he known of the argument, he could have provided proof that reasonable trial counsel at the time would have used the information at the hearing, for example, by seeking an admission from Jagger or else retaining an attorney expert to testify in the post-conviction court. Because the state questioned whether competent counsel would

This court's decision in *Green* suggests the answer in this case. In *Green*, 357 Or at 321, the court noted that *Krummacher*, which first used the phrase "tendency to affect the result," was referring to the result of the prosecution being affected by counsel's failure to object to a question. The court then noted that in *Stevens*, the court had framed the inquiry in terms of a tendency to affect the outcome of the trial, when counsel had failed to investigate and discover witnesses who would impeach the complainant's credibility. *Green*, 357 Or at 322. Thus, the state is correct that the "tendency to affect the outcome" standard involves the ultimate outcome of the proceedings as to which counsel's deficient performance related—in this case, at least, the jury's determination that petitioner was a dangerous offender.

Nevertheless, in our view, the state's argument that petitioner had to establish a reasonable probability that competent counsel would put on an expert like Cooley to testify is wrong on two levels. First, by suggesting that petitioner had a higher bar than proof by "more than mere possibility," the state does not give *Green* its due. In *Green*, this court explained that when a jury determination is involved, it is "inappropriate to use a 'probability' standard for assessing prejudice." 357 Or at 322. Rather, the "tendency to affect the outcome" standard "demands more than mere possibility, but less than probability."

Second, and more importantly, the state's argument puts petitioner's prejudice case in a figurative box, limiting the analysis of impact to whether reasonable defense counsel would have first called Cooley to testify as to the contents of his report. Although the state contends that that is solely how petitioner litigated his case in the post-conviction court and defended that court's judgment on appeal, we disagree.

In the post-conviction court, petitioner alleged that defense counsel "failed to conduct an investigation to support his decision not to obtain a defense psychological evaluation of petitioner," "failed to retain a defense psychologist," and failed to rebut Suckow's testimony by a "defense

have used the Cooley information with respect to proof of the inadequate performance prong, petitioner's argument concerning detriment is not well taken.

psychologist" who "would have provided testimony that petitioner does not meet the diagnostic criteria for an antisocial personality disorder and that petitioner did not suffer from a severe personality disorder." He alleged that, as "a result of counsel's failure to retain a defense psychologist," the jury "relied exclusively upon the testimony of Dr. Suckow to determine that petitioner did suffer from a severe personality disorder." In oral argument to the post-conviction court, petitioner's attorney argued that it was "clear from the transcripts" that defense counsel had failed to "retain an expert witness" and that "his rationale" for failing to do so "doesn't hold water." He argued that problems "Suckow had attributed to a conduct disorder, were actually a reaction disorder from severe abuse that [petitioner] had suffered as a child" and that Suckow had not considered the records from St. Mary's. Petitioner's attorney also argued that defense counsel, although he tried, could not move Suckow off his diagnosis of petitioner, but that "evidence was available * * * that he could have presented through an expert that would have established that [petitioner] didn't qualify for an antisocial personality disorder diagnosis." Similarly, in the Court of Appeals, petitioner's lawyer argued three different theories of deficient performance in briefing: (1) defense counsel was ineffective "because he did not investigate and obtain petitioner's 'juvenile records from St. Mary's that contain[ed] a diagnosis of adjustment reactive disorder'" (quoting the post-conviction court); (2) defense counsel was ineffective by failing to consult with an expert, who "'would have obtained and reviewed historical records'" (quoting Cooley's report); and (3) defense counsel was ineffective by failing to call an expert to testify at the dangerous-offender hearing.

Based on the record, we reject the state's argument, and we credit arguments by petitioner and *amicus* that it was more than a mere possibility that competent defense counsel could have used the information from Cooley's report in ways that "could have tended to affect" the outcome of the dangerous-offender hearing. *Green*, 357 Or at 323; *Lichau*, 333 Or at 365. As we have noted, "many different factors can affect the outcome" of a case. *Green*, 357 Or at 322. On this record, had counsel adequately investigated petitioner's past and consulted a psychological expert, he would have

obtained petitioner's juvenile mental health records and would have learned that the expert could provide ammunition to oppose an enhanced dangerous-offender sentence: (1) an opinion critical of Suckow for failing to obtain and review petitioner's records as a juvenile to support his diagnosis; (2) mitigation evidence that petitioner had been abused by his mother; (3) hard evidence that petitioner did not have a conduct disorder as a youth—a diagnosis by a psychiatrist that petitioner had an adjustment reaction of early adolescence; and (4) an opinion rebutting the anticipated testimony from Suckow that petitioner suffered from an antisocial personality disorder.

And on this record, there was "more than a mere possibility" that counsel could have used that information in cross-examining Suckow or by calling that expert to the stand or doing both. Competent counsel could have used Suckow's failure to obtain the St. Mary's records or other additional data to show that Suckow had not been thorough in reaching his opinion. Competent counsel also could have confronted Suckow with the diagnosis by psychiatrist Johnson that petitioner had an adjustment reaction of early adolescence, without necessarily calling a defense expert witness, to shut down Suckow's explanation to the jury that there was indirect evidence that petitioner had a conduct disorder before age 15. Competent counsel also could have presented a defense expert's testimony, to provide the jury with the information that counsel would have learned upon investigation and consultation, including a direct rebuttal of Suckow's diagnosis and an explanation of petitioner's conduct that was not as damaging as an antisocial personality disorder.[11]

Given the uses to which counsel could put the information from the Cooley report, there was more than a mere possibility that the jury could have rejected the state's contention that petitioner suffered from a "severe personality

---

[11] And, petitioner adds, even apart from using the information at the hearing, competent counsel could have used the information gained from Cooley to try to avoid a dangerous-offender hearing at all and to gain advantage in petitioner's sentencing. For example, he argues, competent counsel might have first attempted to persuade Suckow and the prosecutor to change their minds about petitioner's diagnosis and to negotiate with the prosecutor for a different sentence for petitioner before the scheduled hearing.

disorder." First, as our discussion above of the *Huntley* case and the jury instructions demonstrate, the jury fully understood that it was not bound by any expert testimony about diagnoses—including Suckow's testimony. Second, Cooley opined in the post-conviction proceeding that Suckow could not legitimately have made a diagnosis of an antisocial personality disorder on the facts presented and that petitioner did not have an antisocial personality disorder. As described above, although the St. Mary's records contained additional information about petitioner's history of truancy, running away from home, fighting, and stealing, all of that information was explained by Cooley as being consistent with adjustment disorder in light of petitioner's life as a child, given the abuse in his home. Had the jury heard testimony from an expert like Cooley, it may well have doubted the diagnosis of an antisocial personality disorder and whether the state had proved, beyond a reasonable doubt, that petitioner suffered from a severe personality disorder. *See Apprendi v. New Jersey*, 530 US 466, 490, 120 S Ct 2348, 147 L Ed 2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Accordingly, we conclude that there was more than a mere possibility that counsel's failure to investigate petitioner's past and consult with a defense expert about Suckow's expert report could have tended to affect the outcome of the dangerous-offender proceeding.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.